Allen E. KROEHLER and Lamar Hoover, on behalf of themselves and all others similarly situated

v.

Richard M. SCOTT, Individually and as Mayor of the City of Lancaster, et al.

Civ. A. No. 74-1175.

United States District Court, E. D. Pennsylvania.

March 13, 1975.

David Rudovsky, Philadelphia, Pa., for plaintiffs.

Richard A. Bausher, Reading, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

In this action under the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985(3), plaintiffs seek an injunction prohibiting certain surveillance practices undertaken by defendants and a declaratory judgment that such surveillance deprived them of their constitutional right to privacy under the Fourth Amendment. By Memorandum and Order on August 2, 1974, this Court granted certification under F.R.Civ.P. 23(a) and (b)(2) of a class action.[1] Since the parties have filed a set of stipulations and exhibits, attached hereto as an Appendix, there are no outstanding factual issues which bar a decision on the merits.

These stipulations establish, *inter alia,* the following briefly stated salient facts. Certain of the defendants, in response to complaints of homosexual and drug-related activity occurring in the public men's room at the Penn Central Railroad Station and at Long Park, both in Lancaster, initiated a program of surveillance designed to enable the defendants to apprehend persons involved in these criminal activities. As part of

---

1. The class consists of:

"All persons who have used or desire in the future to use facilities in public restrooms in Lancaster, Pennsylvania, and who do not want to be subject to covert police surveillance, while using these facilities, through the use of holes drilled in the top of stalls, one-way mirrors, or any other similar means, without prior judicial authorization or other process that satisfies the requirements of the Fourth and Fourteenth Amendments."

this program, holes were drilled in the ceilings directly above the toilet stalls to allow the defendants to peer covertly into the stall below and observe, unnoticed, whatever transpired. These clandestine observations were conducted intermittently during the period from January 10, 1974, to May 13, 1974 (Penn Central Station) and from August 3, 1973, to April 1, 1974 (Long Park) at times of most frequent use for a duration of one to two hours, but up to as much as seven hours. Defendants never sought a warrant or obtained judicial authorization prior to conducting any of this surveillance, which has resulted in approximately twenty arrests. The named plaintiffs have, on occasion, used the toilet facilities between August 3, 1973, and May 13, 1974. The total number of innocent persons covertly observed by defendants is unknown, as is their identity.

 At the outset we note that these surveillance activities are not now being conducted so that the exigencies which may have mandated preliminary injunctive relief have abated. See Stipulation 9. Nevertheless, the threat of future surveillance is sufficient to warrant a declaratory judgment. See Stipulation 10; NLRB v. Raytheon Co., 398 U.S. 25, 90 S.Ct. 1547, 26 L.Ed.2d 21 (1970); and 6A Moore, Federal Practice ¶ 67.08[2] at 57–40.[2]

On the stipulated facts, the plaintiffs contend that they are entitled to a reasonable expectation of privacy while using public toilet stalls and, as such, these expectations trigger the protections of the Fourth Amendment. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1969); People v. Triggs, 8 Cal.3d 884, 106 Cal.Rptr. 408, 506 P.2d 232 (1973). These protections, they argue, prohibit the defendants from covertly peering through a hole

placed in the ceiling and into the toilet stalls without first obtaining a search warrant based upon a showing of probable cause that criminal activity was taking place therein or demonstrating at least the exigent circumstances which suspend the requirement of a warrant. Defendants counter with the assertion that persons using public toilet stalls are not entitled to the protections of the Fourth Amendment since no expectation of privacy is reasonably and properly generated in the use of such public facilities. Defendants point to the circumstances which gave rise to the surveillance—namely, numerous complaints of criminal activities, including homosexual and drug-related incidents—and conclude that the surveillance in question was constitutionally proper, prompted by the threat thus posed to the innocent public of which plaintiffs are members. See Stipulations 3, 4, 16 and 26. Defendants rely heavily upon Smayda v. United States, 352 F.2d 251 (9th Cir.) cert. denied 382 U.S. 981, 86 S.Ct. 555, 15 L.Ed.2d 471 (1966).

 The crucial inquiry is whether a person utilizing a public toilet stall is entitled to be free from governmental intrusion in the form of clandestine observation absent a preliminary demonstration of probable cause warranting the conclusion that criminal activity is occurring. Stated differently, and more simply, the issue is whether the Fourth Amendment protects a person who temporarily occupies a toilet stall in a public restroom from observation through small ceiling vents designed exclusively for that purpose in search of suspected criminal activity of a drug-related or sexually-oriented nature. We look first to Katz v. United States, *supra*, which articulated the appropriate test to be utilized under the Fourth Amendment. In *Katz*, the Supreme Court held inad-

---

**2.** Art. III of the Constitution limits federal jurisdiction to "cases" and "controversies". While moot questions do not satisfy this jurisdictional requisite, North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971), an action is not necessarily moot because the conduct giving rise to the complaint has terminated if there is a possibility, as here, of reoccurrence.

missible, in a criminal prosecution, evidence which was procured by a warrantless electronic surveillance of a defendant's conversation in a telephone booth, despite the fact that the booth was designed for public use. "Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures". 389 U.S. 359, 88 S.Ct. at 515. Concluding that the absence of physical intrusion was not determinative, the Court held:

> ". . . the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection . . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–352, 88 S.Ct. at 511.

Justice Harlan observed:

> ". . . there is a two-fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'.
>
> . . . . . .
>
> "The critical fact in this case is that '[o]ne who occupies it, [a telephone booth] shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume' that his conversation is not being intercepted. . . . The point is . . . that it is a temporarily private place whose momentary occupant's expectations are recognized as reasonable." *Id.* 361, 88 S.Ct. 517.

Once it has been determined that the circumstances justify an expectation of privacy which is subjectively and objectively reasonable, the Fourth Amendment requires that the detached restraint of a neutral official be interposed between the individual and the governmental intrusion.

> " 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes', United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64, and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment —subject only to a few specifically established and well-delineated exceptions." [footnotes omitted] 389 U.S. 357, 88 S.Ct. 514.

In applying the expectation of privacy test to the facts and circumstances in question, we are persuaded that plaintiffs harbored reasonable expectations of privacy which are generally recognized as subjectively and objectively reasonable, and are thus entitled to Fourth Amendment protections.[3] It is uncontested that the defendants failed to procure a warrant prior to the commencement of the surveillance in question. See Stipulation 14. As such, we conclude the search was unreasonable *per se.* *Katz, supra.*

■ In reaching this conclusion, we have carefully analyzed the cases which have involved covert police observation of activities undertaken in toilet stalls in public restrooms. In People v. Trigg, *supra,* the Court held inadmissible evidence obtained by a police officer who had sequestered himself in a plumbing access area behind a toilet stall. The state argued that his visual observations did not constitute a "search" within the

---

3. The fact that this is a civil case rather than a criminal prosecution does not limit the applicability of *Katz.* The ultimate objective of the Fourth Amendment is the protection of all persons from unwarranted governmental encroachment upon individual freedoms. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Investigation, 403 U.S. 388, 91 S.Ct, 1999, 29 L.Ed.2d 619 (1971); Danner v. Moore, 306 F.Supp. 433 (E.D.Pa.1969); Hairston v. Hutzler, 334 F.Supp. 251 (W.D.Pa.) aff'd. 468 F.2d 621 (3d Cir. 1972); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

ambit of the Fourth Amendment since the toilet stall under surveillance had no door.[4] The police officer testified that even though the defendant had done nothing suspicious, the officer nevertheless sneaked into his observation post "in case there was a crime committed" as he had done approximately fifty times before. In holding the search illegal, the Court concluded:

> "This would permit the police to make it a routine practice to observe from hidden vantage points the restroom conduct of the public whenever such activities do not occur within fully enclosed toilet stalls and would permit spying on the 'innocent and guilty alike'. Most persons using public restrooms have no reason to suspect that a hidden agent of the state will observe them. The expectation of privacy a person has when he enters a restroom is reasonable and is not diminished or destroyed because the toilet stall being used lacks a door." 106 Cal.Rptr. 412, 506 P.2d 236.

In addition, it was noted that the rights of innocent persons to such privacy were concomitantly violated.

> "In seeking to honor reasonable expectations of privacy throughout application of search and seizure law, we must consider the expectations of the innocent as well as the guilty. When innocent people are subjected to illegal searches—including when, as here, they do not even know their private parts and bodily functions are being exposed to the gaze of the law—their rights are violated even though such searches turn up no evidence of guilt." Id. 106 Cal.Rptr. 413–14, 506 P.2d 237–238.

In Bielicki v. Superior Court, 57 Cal. 2d 602, 21 Cal.Rptr. 552, 371 P.2d 288 (1962), upon receipt of complaints of homosexual activity, two "spy pipes" were installed in the roof of pay toilets in a privately owned amusement park. At the owner's request two police officers perched on the roof to peer through the pipes and observe the conduct of the occupants "until we make an arrest, or until we see that we can't make an arrest". The Court suppressed evidence thus gathered on the ground that the "search" of the unknown occupants was not predicated upon probable cause:

> "[The officer] had no grounds for believing or even suspecting that they [the defendants] had committed or were then commiting any crime or that they were occupying the booths for anything other than a lawful purpose. . . . It was his practice 'a lot of times' each week to climb upon the roof of the restroom, uncap the spypipe, and observe the occupants of the toilets below—i. e., *whoever they might be*. . . . In so doing he spied on innocent and guilty alike. Such a practice amounts to a general exploratory search conducted solely to find evidence of guilt, a practice . . . condemned . . . by federal law . . . .". 21 Cal.Rptr. 554, 371 P.2d 290. [emphasis in original].

Also see Britt v. Superior Court, 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817 (1962); Buchanan v. State (Texas Ct. of Crim.Apl.), 471 S.W.2d 401 (1971); and State v. Bryant, 387 Minn. 205, 177 N.W.2d 800 (1970).

We believe that defendants' reliance on Smayda v. United States, *supra*, People v. Young, 214 Cal.App.2d 131, 29 Cal.Rptr. 492 (1962) and People v. Norton, 209 Cal.App.2d 73, 25 Cal.Rptr. 676 (1963) is misplaced. *Smayda* preceded *Katz*, and the *Norton* and *Young* cases were questioned in People v. Triggs, *supra*. Moreover, these cases are not binding on this Court and we decline to follow them.

---

4. In the Stipulations, it is indicated the surveillance involved both door and doorless toilet stalls. Since we find that the expectation of privacy is generated by the nature of the activity involved, rather than by the precise physical characteristics of the stall, whether or not the stalls had doors is not a crucially material inquiry.

We are neither unmindful of the numerous complaints of criminal activity which properly spurred the defendants to act expeditiously nor critical of police motivations aimed at ridding the community of criminal activity.[5] However, we are compelled to safeguard zealously the fundamental guarantees embodied in the Constitution, particularly as they pertain to innocent and law-abiding citizens properly using public facilities. Therefore, we cannot ignore the fact that these surveillances swept into the gaze of the government not only those involved in criminal activity, but also countless innocent and unknowing persons who reasonably expected and were properly entitled to a modicum of privacy. Such a practice cannot be condoned on the sole ground that the defendants understandably expected to find evidence of criminal activity on the part of certain individuals while simultaneously subjecting all individuals using the facilities to a general "search". The Fourth Amendment requires, at a minimum, the determination by a detached official that there is probable cause warranting a search prior to its commencement, or at least the presence of those rare exigent circumstances which justify a warrantless search. The warrantless and nonselective search of *all* individuals who happen to be in the area cannot be justified under the circumstances here involved.

We are not unaware of the practical problems involved in ferreting out criminal activity while concurrently protecting the rights of the innocent. Those problems, in the final analysis, must be overcome by the resourcefulness and creativity of the defendants using the efficient techniques and sophisticated equipment today available to law enforcement officers. Thus, we hold only that the practices outlined on the stipulated facts fail to comport with the Constitution, and we go no further.

In thus concluding, we recognize circumstances in which such surveillance practices might well satisfy Constitutional requirements. For example, should a law enforcement officer observe an individual enter the stall with drug-related paraphernalia or what appears to be such, his immediate surveillance of the stall in the manner here followed appears warranted. Similarly, when two individuals enter the stall, neither of whom appears to be an invalid or handicapped as to require assistance, the immediate surveillance of the stall, without the delay incident to a warrant appears to pass Constitutional muster. An appropriate order will be entered.

## APPENDIX

### STIPULATION OF FACTS

The parties to the above-captioned action hereby stipulate to the facts hereinbelow contained:

1. Certain members of the Police Department of the City of Lancaster, Lancaster County, Pennsylvania, have in the past, engaged in surveillance activities of certain public areas, including men's public toilet facility areas.

2. The police surveillance activities referred to in Paragraph 1 above were conducted at the public restrooms maintained for men at the City of Lancaster's public park known as Long Park, and the public restroom maintained for men at the Penn Central Railroad Station, Lancaster, Pennsylvania, together with the general areas surrounding the same.

3. The police surveillance activities of the Long Park men's public restroom area were initiated following receipt of complaints from the Parks Department of the City of Lancaster which in turn had received complaints from a number of citizens, parents of minor children and Parks Department employees of homosexual activity in the men's public restroom situate in Long Park.

4. The police surveillance activities of the Penn Central Railroad Station and the men's public restroom area were ini-

---

5. See Stipulation 7.

tiated following receipt of information from a confidential informant that there was illegal traffic of drugs into the Lancaster area by persons using trains from the cities of New York and Philadelphia running into the City of Lancaster's said railroad station. The police surveillance activities here were expanded upon after the police officers involved in the surveillance observed suspected homosexuals frequenting the Penn Central Railroad Station and the men's public restrooms and surrounding area and after said suspected homosexuals had made certain approaches to the plain clothes police officers. The expanded surveillance activities included drilling two holes in the ceiling of the men's public restroom area.

5. The said police surveillance of the Long Park men's public restrooms and surrounding area commenced on or about August 3, 1973, and continued on an intermittent basis until April 1, 1974.

6. The said police surveillance of the Penn Central Railroad Station's men's public restrooms and surrounding area commenced on or about January 10, 1974, and continued on an intermittent basis until May 13, 1974.

7. Police surveillance from holes located in ceilings above certain stalls in the men's rooms of Long Park and the Penn Central Railroad Station situate in Lancaster, Pennsylvania, was conducted two days in August, 1973; thirteen days in January, 1974; seven days in February, 1974; six days in March, 1974; and one day in April, 1974. The average duration of such surveillance activities varied during said periods. Several surveillances were conducted for periods extending from seven to nine hours duration on a given day. However, most of the surveillances averaged one to two hours duration on each of the said days. It is not possible to determine the total number of persons seen entering the men's rooms in the above-identified locations.

8. The police surveillances at Long Park and the Penn Central Railroad station were conducted during periods of time when the public traffic at these facilities was greatest and, therefore, the police believed that they might witness unlawful and/or illegal conduct on the part of some persons frequenting or using those areas.

9. Such police surveillance activities were discontinued because the surveillance activities were discovered by those persons who were the object of the surveillance, and because the police on the surveillance detail were required to perform other police duties and activities.

10. Although the Police Department and the City of Lancaster have discontinued surveillance of the men's rooms at Penn Central Railroad Station and Long Park, through the peep holes located above several stalls situate therein, resumption of such surveillance may be initiated if new complaints are received or if other circumstances are deemed to warrant such action.

11. Said police surveillance of the Long Park men's public restroom facility was conducted by police in plain clothes in the general area surrounding the men's public restroom facility and by visual observation inside the public restroom from rafters therein through two (2) holes drilled in the ceiling of the public restroom.

12. Said police surveillance of the Penn Central Railroad Station public restroom facility was conducted by police in plain clothes within the station building generally, including the general area in and about the men's public restroom situate therein, and by visual observation inside the public restroom from a crawl space above said restroom through two (2) holes drilled in the ceiling of the restroom.

13. The police officers employed by the Lancaster Police Department who were engaged in the police surveillance activities referred to above are as follows:

Officer Donald Flick
Officer Harry Mellinger
Officer Ronald Kuhn

Detective Paul Rose
Officer Harold Hohman
Officer Norman Carr

14. Said police surveillance activities were conducted without having first received any warrant or judicial authorization therefor.

15. Said police surveillance activities were conducted by the police officers identified in Paragraph 13 hereof in an effort to effect the identification, arrest and conviction of those persons who frequented the men's public restrooms and the areas surrounding the same for engaging in unlawful deviate sexual behavior and engaging in the unlawful traffic of drugs, and to obtain evidence pertaining thereto.

16. The areas selected for the above-described police surveillance activities were chosen because, in the instance of the Long Park facility, numerous complaints had been made concerning homosexual activities in the area as averred in Paragraph 3 above; and in the instance of the Penn Central Railroad Station, because of information received by the police concerning illegal traffic in drugs within the said railroad station premises.

17. The police officers engaged in said surveillance activities were instructed by their superior officers to take such action as was necessary to stop any unlawful activity which might be observed during the course of their surveillance, including but not limited to unlawful homosexual activity and illegal traffic and use of drugs.

18. The police officers engaged in said surveillance activities did not believe they discriminated in the course of the performance of their said police functions.

19. The total arrests made by the Lancaster police department as a result of the abovementioned police surveillance activities were twenty (20) in number.

20. The charges brought against those persons arrested as a result of said surveillance activity were one charge of harassment and nineteen charges of voluntary deviate sexual intercourse.

21. Ten (10) of those persons arrested as aforesaid, have pleaded guilty as charged and paid fines and costs imposed. The remaining ten (10) persons have posted bail and their cases are pending.

22. Plaintiffs, Kroehler and Hoover, have, on occasion both used the toilet facilities in the men's rooms in the Railroad Station and Long Park that are the subject of this proceeding. Such use occurred some time between August 3, 1973, and April 1, 1974.

23. Based on their prior experiences and living and travel arrangements, plaintiffs, Kroehler and Hoover, are likely to use said facilities in the future.

24. Because the surveillance complained of was covert, and because the identities of persons who were actually surveilled by the defendant police officers are not known (except for persons arrested), it is not possible to determine whether the plaintiffs were in fact surveilled or whether the plaintiffs personally know anyone who was surveilled during this period.

25. The plaintiffs do not know any of the persons who were arrested by the Lancaster police in the area of said men's public restroom for voluntary deviate sexual intercourse or actions related thereto personally; however, the plaintiffs are familiar with the name and have heard of Dr. Luther Binkley, who is one of the persons arrested and charged with said unlawful activity.

26. The plaintiffs now know that the said men's room facilities were allegedly being used as places of solicitation by individuals who engaged in voluntary deviate sexual intercourse and of the arrest of such persons that followed said activity.

27. The attached exhibits are included as correctly representing the physical surroundings of the men's rooms at the Railroad Station and Long Park.

EXHIBIT A: Sketch of Men's Rest Room, Penn Central Station, Lancaster.

EXHIBIT B: Series of seven photographs of the stalls and surrounding areas of the Penn Central Station Men's Room including the two stalls over which the peep holes were drilled and used for surveillance.

It is stipulated that from these two holes, the defendants could observe all activity within the two stalls without doors, and could only observe a small part of the adjacent stall.

EXHIBIT C: Series of five photographs of writings on walls of Men's Room at Penn Central Railroad Station. These photographs were taken after the surveillance complained of in this action was terminated.

It is stipulated that writings such as those that appear in this series of photographs also appear on walls of certain other public men's rooms.

EXHIBIT D: Sketch of Men's Rest Room at Men's Room, Long Park.

EXHIBIT E: Series of four photographs of the Men's Room at Long Park.

DATED: December 10, 1974