[No. 7615-6-III. Division Three. July 23, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. FRANCISCO BERBER, *Appellant.*

584

*Victor H. Lara* and *Schwab, Kurtz & Hurley,* for appellant (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Donald E. Kresse, Jr., Deputy,* for respondent.

MUNSON, J.—Francisco Berber appeals his conviction for possession of a controlled substance, contending the trial court erred in denying his motion to suppress the cocaine seized by the police. We affirm.

While engaged in a routine nightly "bar check," two officers from the Grandview Police Department entered the Past–Time Tavern in that city and proceeded to the men's rest room. The officers knew this rest room was an area where narcotics were commonly used.

The rest room consisted of one urinal, one toilet, and a wash basin, in that order as one enters.[1] The urinal was separated from the toilet by a particle board partition

---

[1]The illustration is a portion of an exhibit of a hand–drawn sketch depicting the rest room area. The identifications have been supplied from the testimony of the officers.

extending 2 to 3 feet from the wall. Although the record does not reflect the height of the partition, it is evident the toilet was not enclosed. The urinal and the toilet were on one wall, while the wash basin was on an adjacent wall opposite the entrance.

When the officers entered the rest room, one person was at the urinal. Mr. Berber aroused the officers' suspicions because, although standing over the toilet, his hands were positioned up around his chest. It appeared to the officers he was not using the facility for its common purpose. One of the officers, several inches taller than Mr. Berber, approached him from behind to within 2 inches and peered over his shoulder. He observed what he believed to be cocaine in Mr. Berber's left hand, enclosed in a cellophane container, which apparently was being ingested. The officer seized the cellophane package, the contents which proved

to be cocaine, and placed Mr. Berber under arrest. This entire transaction—the officers entering the rest room, observing Mr. Berber, peering over his shoulder, and seizing the cellophane package—occurred almost instantaneously.

Mr. Berber was charged with possession of a controlled substance. He moved to suppress the cocaine, alleging that while at the toilet he had a legitimate expectation of privacy and the officer's glance over his shoulder constituted an impermissible warrantless search. The trial court held Mr. Berber had no reasonable expectation of privacy while standing over the toilet in this public rest room. The court denied the motion. Thereafter, both parties stipulated to the above facts at a bench trial; the court found him guilty; this appeal followed.

The fundamental issue is whether the officer's glance over Mr. Berber's shoulder while he stood over an open toilet in this public rest room constituted an unreasonable intrusion or search subject to the protections of Const. art. 1, § 7. Mr. Berber asserts individuals in a public rest room retain a legitimate expectation of privacy, even at an unenclosed toilet. The State urges that the officer's observation of Mr. Berber, given these facts, is not a "search." Rather, the officer merely observed "public" conduct.

Const. art. 1, § 7 provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This provision places greater emphasis on the privacy interests of individuals than the Fourth Amendment and, consequently, has been interpreted to provide greater protections to the privacy rights of Washington citizens than the Fourth Amendment. *State v. Bell,* 108 Wn.2d 193, 196, 737 P.2d 254 (1987); *State v. Myrick,* 102 Wn.2d 506, 510, 688 P.2d 151 (1984); *State v. Nelson,* 47 Wn. App. 157, 159, 734 P.2d 516 (1987). Notwithstanding this heightened protection, federal decisions validly continue to play a guiding role in our analysis of Const. art. 1, § 7. *Myrick,* at 510. *State v. Gunwall,* 106 Wn.2d 54, 60–61, 720 P.2d 808 (1986) (citing *State v. Hunt,* 91 N.J. 338, 363,

450 A.2d 952 (1982) (Handler, J., concurring)). Consequently, the following analysis relies in part upon decisions of the United States Supreme Court, as well as other courts' interpretations of the Fourth Amendment. However, we base our analysis and ultimate decision on the Washington Constitution. *See Myrick,* at 510.

 As noted, Const. art. 1, § 7 guarantees that individuals will be safe from unreasonable invasions of their private affairs. *State v. Kennedy,* 107 Wn.2d 1, 5, 726 P.2d 445 (1986); *State v. Stroud,* 106 Wn.2d 144, 167, 720 P.2d 436 (1986) (Durham, J., concurring); *State v. Myrick, supra; State v. Simpson,* 95 Wn.2d 170, 178, 622 P.2d 1199 (1980). A violation of this provision depends on whether the individual invoking its protection demonstrates a "legitimate" or "reasonable" expectation of privacy in a place or object that is invaded by governmental action. *Compare Stroud,* at 159, 167 (Durham, J., concurring) *with Myrick,* at 510–11. Justice Durham, in her concurring opinion in *Stroud,* at 159, states: "[O]ur court analyze[s] search and seizure issues in terms of a person's reasonable expectation of privacy. This is an objective 'reasonable man' standard, not a test of a person's subjective expectation of privacy." Moreover, *Myrick,* at 510–11, provides:

> Const. art. 1, § 7 analysis encompasses those legitimate privacy expectations protected by the Fourth Amendment, *but is not confined to the subjective privacy expectations* of modern citizens who, due to well publicized advances in surveillance technology, are learning to expect diminished privacy in many aspects of their lives. Rather, it focuses on those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.

(Citations omitted. Italics ours.)

It is unclear after *Myrick* and *Stroud* whether the 2–prong expectation of privacy test developed by the United States Supreme Court for purposes of Fourth Amendment

analysis[2] is to be retained under a Const. art. 1, § 7 analysis. Nock, *Seizing Opportunity, Searching for Theory: Article 1, Section 7,* 8 U. Puget Sound L. Rev. 331, 366 (1984). *See also* Utter, *Survey of Washington Search and Seizure Law,* 9 U. Puget Sound L. Rev. 1, 19 (1985). In the absence of any clear indication from our Supreme Court as to applicability of the federal test, we will analyze search and seizure issues by reference to that test.

We assume Mr. Berber had a subjective expectation of privacy, so the first prong of the federal test is answered in the affirmative. However, under the second prong of the test is this expectation one that society is prepared to recognize as legitimate when analyzed according to an "objective 'reasonable man' standard"? *Stroud,* at 159 (Durham, J., concurring); *Myrick,* at 510. *Cf. Oliver v. United States,* 466 U.S. 170, 188, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984); *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979). For purposes of Const. art. 1, § 7 analysis, our examination of Fourth Amendment cases suggests several considerations which may profitably be utilized in making what is essentially the identical determination under our constitution. These considerations are: (1) society's belief that certain areas are ordinarily understood to afford personal privacy; (2) the character of the area in which the claimed privacy interest is asserted; (3) the way in which the area is used; and (4) the method, means, or manner by which the government agents intrude into the area. We do not mean to suggest these considerations are relevant in every article 1, section 7 case or that their

---

[2]Whether a legitimate expectation of privacy is violated by a search and/or seizure involves two discrete questions under a Fourth Amendment analysis. First, has an individual by his or her conduct exhibited a subjective expectation of privacy in a particular place or object? *Katz v. United States,* 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). Second, is the individual's subjective expectation of privacy one that society is prepared to recognize? *Katz,* 389 U.S. at 361. Put another way, were the individual's subjective expectations, when viewed objectively, justified under the circumstances? *Oliver v. United States,* 466 U.S. 170, 188, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984); *Smith v. Maryland,* 442 U.S. 735, 740, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979).

mechanical application will lead to a "correct" result. Nonetheless, they are useful analytical tools in attempting to determine whether an individual's legitimate expectation of privacy has been invaded.

■ First, based upon widely accepted social norms, the area within an occupied toilet stall is properly characterized as "private." Occupants thereof ordinarily find it highly offensive to have their private parts and bodily functions exposed to law enforcement officers. *See People v. Triggs,* 8 Cal. 3d 884, 506 P.2d 232, 238, 106 Cal. Rptr. 408 (1973). Moreover, the fact a toilet or urinal is not completely shielded from public view does not necessarily destroy the expectation of privacy an occupant possesses. *See, e.g., Kroehler v. Scott,* 391 F. Supp. 1114, 1117 (E.D. Pa. 1975); *State v. Holt,* 291 Or. 343, 630 P.2d 854, 857 (1981); *Triggs,* 506 P.2d at 236; *Brown v. State,* 3 Md. App. 90, 94, 238 A.2d 147, 149 (1968) ("a person who enters an enclosed stall . . . is entitled . . . to the modicum of privacy its design affords"). *Cf. Myrick,* at 513 (although "the language of Const. art. 1, § 7 precludes a 'protected places' analysis" the nature of the area into which intrusion took place is one factor in determining whether the intrusion is constitutional).

These expectations are strongest where the toilet in a public rest room is fully enclosed. *See People v. Mercado,* 68 N.Y.2d 874, 501 N.E.2d 27, 29, 508 N.Y.S.2d 419 (1986). However, when viewed objectively, most citizens do not expect the same degree of privacy where the toilet in a public rest room is exposed to the public. Justice Durham, concurring in *Stroud,* at 167, noted society as a whole possesses a diminished expectation of privacy in certain places. For example, a person's residence is a highly private place under most circumstances and gives rise to a legitimate expectation of privacy. *See* Const. art. 1, § 7 (home given special protection); *State v. Holeman,* 103 Wn.2d 426, 429, 693 P.2d 89 (1985). On the other hand, travel in an automobile is a relatively public endeavor; the openness of the automobile gives rise to what may be characterized as a

"diminished expectation of privacy." *Stroud,* at 168 (Durham, J., concurring). The location of this toilet in a public rest room, its lack of any real enclosure, and the openness of the view from the general rest room area contribute to a diminished expectation of privacy by those using the facilities therein.

Second, the toilet's location and exposure tend to support the State's contention that Mr. Berber's expectation was not reasonable. Mr. Berber contends the toilet was located in a "stall" because of the partition separating it from the urinal. The area surrounding the toilet may be characterized as a "stall" only by the grossest of generalizations; *anyone* entering the rest room had visual access to it. The officers saw no more than an ordinary member of the public would have seen upon entering the rest room. Assuming arguendo a "stall" existed, 1 W. LaFave, *Search and Seizure* § 2.4(c), at 440–41 (2d ed. 1987) notes: "[I]f the police merely enter a rest room and see conduct occurring within a stall which is 'readily visible and accessible' to any member of the public who so enters, there is . . . no intrusion into a justified expectation of privacy." (Footnotes omitted.)

Third, the way a particular area is used may be relevant to the determination of whether a legitimate expectation of privacy exists therein. *Oliver,* 466 U.S. at 178; *Rakas v. Illinois,* 439 U.S. 128, 152–53, 58 L. Ed. 387, 99 S. Ct. 421 (1978). *Kroehler,* at 1118 n.4 states: "[T]he expectation of privacy is generated by the nature of the activity involved, rather than by the precise physical characteristics of the stall . . ." Analysis under this consideration generally focuses on how the area is ordinarily used. Under normal circumstances, the utilization of a toilet for its customary purpose would give rise to an expectation of privacy for purposes of constitutional analysis.

However, the particular manner in which the area is used becomes the relevant inquiry where the person's activities within the area are exposed to the general public. For example, the user of an enclosed public telephone booth has a legitimate expectation of privacy regarding auditory

transmissions, but not with respect to visual access of his or her actions therein. *Katz v. United States,* 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). In a statement we find equally applicable to Const. art. 1, § 7, *Katz,* 389 U.S. at 351–52 states the Fourth Amendment protects

> people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

Justice Harlan's concurrence in *Katz* noted:

> Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable.

*Katz,* 389 U.S. at 361; *see also State v. Jordan,* 29 Wn. App. 924, 927, 631 P.2d 989 (1981).

"The test of legitimacy is not whether the individual chooses to conceal assertively 'private' activity." *Oliver,* 466 U.S. at 182. The issue is whether the government's intrusion infringes upon the personal and societal values protected by Const. art. 1, § 7. *Cf.* W. LaFave, at 311–12 (citing Note, *From Private Places to Personal Privacy: A Post–Katz Study of Fourth Amendment Protection,* 43 N.Y.U. L. Rev. 968, 983 (1968)). Given the openness of the location in which he conducted his illegal activity and the officers' testimony that it was obvious he was not using the area for its customary purpose, his attempt to conceal his illegal activity by facing the toilet does not indicate that his expectation of privacy, if any, was justified.

Finally, the method by which the officers here intruded into the area is also relevant to our determination.[3] W.

---

[3]Because Const. art. 1, § 7 focuses on privacy interests, rather than police conduct, this factor is not as important as if under a Fourth Amendment analysis.

LaFave, at 314, provides that the ultimate question under search and seizure analysis

> [i]s whether, if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society.

(Footnotes omitted.) (quoting Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 403 (1974)).

The circumstances here are clearly distinguishable from those in *Triggs, Kroehler,* and the other decisions involving toilet stalls relied upon by Mr. Berber. In those cases, the police surreptitiously viewed from holes, vents, or by other clandestine means the occupants of enclosed toilets. These secret observations subjected the innocent, as well as the guilty, to unreasonable intrusions.

Unlike those decisions, the officer's observation here was not surreptitious. Mr. Berber cannot be characterized as being in a stall. Mr. Berber, though perhaps possessing a subjective or actual expectation of privacy, did not, when viewed objectively, possess a legitimate or reasonable expectation of privacy. *See Stroud,* at 159 (Durham, J., concurring).

The conviction is affirmed.

GREEN, J., concurs.

McINTURFF, C.J. (dissenting)—Because I believe the evidence seized in this case should have been suppressed, I dissent. For the most part, the majority and I agree on the facts. However, the majority has omitted several facts relevant to the visibility into the toilet stall from the general rest room area which bear on the question of whether Mr. Berber had a Fourth Amendment protected privacy inter-

---

Nonetheless, the manner of the intrusion appears to retain some importance under Const. art. 1, § 7 analysis. *See Myrick,* at 514 (*unaided* aerial surveillance of defendant's property not a search under Const. art. 1, § 7).

est which was intruded upon.

Officer Miller (hereafter the officer) testified that upon entering the rest room he could see that Mr. Berber was in the stall, but could not see anything but Mr. Berber's back and "the position of his hands" (*i.e.,* up around his chest) when he walked in.[4]

The officer stated he did not know what Mr. Berber was doing with his hands at this time. The officer walked up behind Mr. Berber to within a couple of inches of his back and looked over his shoulder. At this point, the officer could see cocaine in Mr. Berber's hands. The officer testified that if he had been standing 2 or 3 feet back from Mr. Berber, he would not have been able to observe anything over Mr. Berber's shoulder. Because of these facts, I disagree with the majority's statement that "*anyone* entering the rest room had visual access" into the stall. Majority, at 590. It would be more appropriate to conclude Mr. Berber's backside at least partially blocked the view into the toilet stall

---

[4]Officer Miller testified:

"Q Where was Mr. Berber standing?

"A Standing right here.

"Q Right in front of the commode?

"A That's correct.

"Q Now when you first walked in, you mentioned that you saw him doing nothing, just standing there.

"A *Just standing there.*

"Q And when you actually saw what you observed, the suspected cocaine, is after you looked over his shoulder?

"A That's correct.

"Q Before that you didn't observe anything suspicious?

"A No, there was a subject standing here and, as I said, another subject had finished and was exiting as Officer Dobrauc and myself walked in.

"Q Now how far did you stand from him when you observed the suspected cocaine?

"A *I was right on his back.*

"Q *Would you say a couple inches from him?*

"A *A couple inches.*

"Q And you peered over his shoulder?

"A I am considerably taller than the defendant.

"Q Now if he had been 2 or 3 feet back, would you have been able to observe anything over his shoulder?

"A *Two or three feet back, no.*" (Italics mine.)

from the remainder of the rest room.

Further, the majority included a rough drawing of the rest room area which is of little value in understanding the privacy interests at stake. I say this because it lacks the physical proportions necessary to put the officer's testimony in perspective.

The majority rightly assumed Mr. Berber possessed a subjective expectation of privacy while standing in the toilet stall. The majority also rightly concluded that under normal circumstances the utilization of a toilet stall for its customary purpose would give rise to an expectation of privacy for purposes of constitutional analysis. The majority then examined the openness of the location, the way in which the area was used and the method of the officer's intrusion into the area. Majority, at 590–92. The majority then concluded Mr. Berber had no objectively reasonable expectation of privacy which is protected by Const. art. 1, § 7.

Utilizing these factors, I conclude that Mr. Berber's expectation of privacy is an objectively reasonable one, and intrusion thereon is a search which is constitutionally impermissible under Const. art. 1, § 7 unless it was accompanied by a search warrant supported by probable cause or within a valid exception to warrant requirement. *State v. Myrick,* 102 Wn.2d 506, 510, 688 P.2d 151 (1984).

First, the openness of the toilet stall is not a determinative factor. In *Brown v. State,* 3 Md. App. 90, 238 A.2d 147 (1968), a factually similar case, the court invalidated seizure of narcotic paraphernalia when an officer stuck his head over the door to a toilet stall, thus physically intruding into the area. *Brown v. State, supra* at 94 stated:

> We believe that a person who enters an enclosed stall in a public toilet, with the door closed behind him, is entitled, at least, to the modicum of privacy its design affords, certainly to the extent that he will not be joined by an uninvited guest or spied upon by probing eyes in a head physically intruding into the area.

*State v. Biggar,* ___ Hawaii ___, 716 P.2d 493 (1986) is

another case which is factually similar. There, in 716 P.2d at 494, an officer assigned to a drug enforcement task force at an airport allowed a man who was suspected of purchasing a suspicious ticket to use the rest room. The man closed the door on the toilet stall. The officer peered through a crack in the door and observed the suspect standing near the toilet but apparently not using it. *Biggar,* 716 P.2d at 494. The crack was about one–half inch wide and the detective testified it afforded him nothing more than an occasional glimpse of the suspect's right shoulder. *Biggar,* 716 P.2d at 494 n.3. The officer became very suspicious that the suspect was trying to destroy evidence. The officer entered the adjacent toilet stall and looked over the stall into the suspect's stall where he observed the suspect withdrawing his hand from the disposable seat cover dispenser. After the suspect left the stall, the officer discovered a packet of cocaine in the dispenser. *Biggar,* 716 P.2d at 494. There, at page 495, the Supreme Court of Hawaii held that the suspect had a subjective expectation of privacy in the toilet stall despite the fact that the door did not close completely. The design of the door, with a one–half inch crack, did not destroy this expectation of privacy since it was too small to afford the officer more than a view of the suspect's shoulder. Further, the court held "it is beyond dispute that an expectation of privacy in a closed toilet stall is one that society would recognize as objectively reasonable." *Biggar,* 716 P.2d at 495. The court held the officer lacked probable cause to climb on the toilet seat in the adjacent stall and look over the partition. The court did not reach the issue of whether the officer's peering through the crack in the door amounted to a search. *Biggar,* 716 P.2d at 495.

Also, the fact that Mr. Berber was not in an enclosed stall likewise is not determinative. In *People v. Triggs,* 8 Cal. 3d 884, 506 P.2d 232, 106 Cal. Rptr. 408 (1973), the court considered clandestine observations of doorless stalls in public rest rooms. That court rejected the argument that these observations were not searches because the conduct could have been viewed by an officer from a place where the

public had a right to be and therefore there could be no reasonable expectation that it would be private. The court stated, at page 891: "The expectation of privacy a person has when he enters a restroom is reasonable and is not diminished or destroyed because the toilet stall being used lacks a door." *See also Kroehler v. Scott,* 391 F. Supp. 1114 (E.D. Pa. 1975).

A reasonable expectation of privacy may be constitutionally protected even though the expectation is of less than total privacy. As stated in *State v. Holt,* 291 Or. 343, 348, 630 P.2d 854, 857 (1981):

> [Some cases] tend to decide whether an occupant has a reasonable expectation of privacy according to whether there is a door on the stall. In our opinion, that distinction is too simple to adequately protect reasonable expectations of privacy held by persons who use public restrooms. As *Katz* [*v. United States,* 389 U.S. 347 (1967)] made clear, *the law may protect a reasonable expectation of less than total privacy, (i.e.,* in *Katz* an expectation of auditory privacy, but not visual privacy). One who chooses to use a doorless stall may desire total privacy, but he cannot reasonably expect it. *Rather, he accepts a limited risk of observation as a consequence of the limitations of the physical structure.*

(Citations omitted. Italics mine.)

Having concluded presence or absence of a door does not answer the question, I would look at the modicum of privacy the design of the stall affords, per *Brown v. State, supra.* Here, the design of the stall afforded some privacy to the occupant. Walls on three sides restricted the public's view into the stall. Additionally, the body of the person using the stall restricted view into the stall—in essence, the occupant's backside became the door, and to the extent the backside of the occupant restricted the view into the stall, privacy was afforded by the design of the stall. Here, the police officer admitted he could see nothing but Mr. Berber's backside and the position of his hands without intruding into the stall to peer over Mr. Berber's shoulder.

I disagree with the majority's conclusion that given the

design of the stall the officer saw no more than an ordinary member of the public would have seen if entering the rest room. Here, what the officer saw from the view of an ordinary member of the public was only Mr. Berber's backside. Cases which have discussed this factor involved incriminating conduct apparent to the officer before entry into the toilet stall or other protected area cases. *United States v. Smith,* 293 A.2d 856, 858 (D.C. 1972); *Kirsch v. State,* 10 Md. App. 565, 271 A.2d 770, 771 (1970). In *People v. Triggs, supra* at 895 n.7, the court said: "Should they discover from a location open to the public, the commission of *criminal acts,* their observation of what is in plain view involves no search, and is not subject to the strictures of the Fourth Amendment." (Italics mine.) However, observation of incriminating acts is not equivalent to observation of "arguably suspicious behavior . . . susceptible to an innocent explanation." *People v. Triggs, supra* at 895. *See also State v. Biggar,* 716 P.2d at 494, 496, where purchase of a suspicious airline ticket, apparent nonuse of toilet facilities in the stall, and nervousness did not amount to probable cause to search. Here, the view of Mr. Berber's backside and arms raised to his chest did not provide any evidence that Mr. Berber was engaged in a criminal act. The fact that his arms were raised to his chest and not in the usual position is merely arguably suspicious behavior and is susceptible to an innocent explanation—for example, the buttoning of a shirt, or removal of a cigarette package from a shirt pocket.

Next, the majority examines the way the particular area was used to decide if a legitimate expectation of privacy exists therein. Here, the majority argues the fact that Mr. Berber did not appear to be using the facility to urinate bears on whether his expectation of privacy was reasonable. The court in *Biggar,* 716 P.2d at 494, found a reasonable expectation of privacy where the suspect stood near a toilet but did not appear to be using it. The mere fact that Mr. Berber was not urinating at the time the officers entered the rest room is not enough to destroy the reasonableness

of an expectation of privacy in this instance.

Finally, the majority examines the method of the officer's intrusion into the area. I disagree with the majority's conclusion that this particular form of surveillance is one that may be permitted to go unregulated by constitutional restraints. Physical intrusion into a toilet stall is just as abhorrent to the sensibilities of the average citizen as clandestine surveillance of the activities therein. *Biggar; Brown v. State, supra.* It cannot be said from the officer's testimony that he possessed any evidence of criminal activity before he peered over Mr. Berber's shoulder. Mr. Berber's bathroom behavior was significantly less suspicious than the behavior observed in *Biggar*, 716 P.2d at 496, where the court said:

> While it is obvious from the record that Detective Peterson suspected Appellant of trying to destroy or abandon drugs, it is equally obvious that Appellant's bathroom behavior was insufficient to justify Officer Peterson's observing him from the adjacent stall.

(Footnote omitted.)

As a matter of policy, protection under Const. art. 1, § 7 should be determined by focusing on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant." *State v. Myrick, supra* at 511. The expectation that a citizen's privacy will not be intruded upon by the State while occupying a toilet stall, even in a public rest room, is exactly the type of "private affair" Const. art. 1, § 7 protects. Based on these facts, it cannot be said the officers possessed probable cause to search Mr. Berber. Standing within 2 inches of a person standing in a toilet stall is not only an invasion of his constitutional right of privacy, but is abhorrent on its face.[5]

Therefore, having concluded the officers conducted an

---

[5]It is not difficult for me to perceive that the conduct of a person standing 2 inches away from a man in a toilet stall and peering over his shoulder could provoke an immediate assault upon the intruder.

unlawful search, the evidence obtained should have been excluded. I would reverse the conviction of Mr. Berber.

Review denied by Supreme Court November 4, 1987.