**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5708-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GEORGE J. HOLIDAY,

     Defendant-Appellant.

_____

Argued September 16, 2021 – Decided September 28, 2021

Before Judges Haas and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 16-04-0680.

Nakea J. Barksdale, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the brief).

PER CURIAM

Defendant George J. Holiday appeals from a December 19, 2018 order denying his motion to suppress. We affirm.

This matter arises from a drug transaction at the Cheesequake Service Area on the Garden State Parkway. A plain clothes State Police detail, including Detective Shawn Bracht, was assigned to patrol the service area. Judge Colleen M. Flynn conducted a two-day hearing, during which the State called Bracht to testify, and the defense called Juan Tenreiro and John McMahon—both investigators for the Public Defender.

Following the hearing, Judge Flynn summarized the relevant facts in a sixteen-page written opinion as follows:

> [Detectives Miguel] Guarda and Bracht were conducting surveillance in the main lot in an unmarked car. Det[ective Troy] Hedberg and Det[ective Thomas] Holmes were conducting surveillance of the main lot in . . . Hedberg's unmarked troop car. While conducting surveillance they observed a silver Cadillac CTS circling the lot. The vehicle was occupied by two individuals who were unknown at the time. The driver was later identified as Cameron London and the passenger was later identified as Burudi London. Officers observed Cameron using his cellular phone while driving and looking around the lot. More particularly, [Bracht] testified that Cameron appeared to be scanning the lot and looking for someone. . . . The vehicle eventually parked two rows ahead of Guarda and Bracht and the defendants sat in the vehicle

2

for an indeterminate amount of time. . . . Bracht did not recall the exact amount of time, but during the time while parked, they were in and out of the car, and on and off their cellular phones. . . .

Detectives then observed a black Ford Ranger circling the parking lot. After circling, the vehicle pulled into a parking spot near Cameron's vehicle, but then quickly relocated to a spot two rows behind Guarda and Bracht. The Ford was driven by [Robert] Applegate and riding with passenger Holiday. Holiday was observed talking on his cellphone when he exited the vehicle[] and started walking toward Cameron's car. The detective described him as looking confused and nervous, and appearing to be looking for someone. Holiday then hung up his phone, changed directions and started walking towards the main building.

. . . Bracht exited his vehicle and followed Holiday into the building to continue observation. . . . Guarda observed Cameron exit his vehicle and walk towards the main building, which he relayed to Bracht by calling him.

. . . Bracht followed Holiday into the main building and into the men's bathroom. Holiday entered a stall near the end of the row . . . . Bracht went to a urinal which was in a row of urinals across from a row of stalls, pretending to use the urinal. The rows of stalls and urinals were between eight and twelve feet apart. Bracht's urinal was left of center when facing the urinals, at an angle across from the stall containing Holiday. In "less than a minute," Bracht observed Cameron enter the men's restroom and enter the stall adjacent Holiday. Holiday and Cameron then engaged in conversation, but . . . Bracht could not make out what was being said because they were whispering. Bracht continued to monitor their actions while facing the

urinal, by turning his head and looking over his shoulder. He testified that he observed Cameron pass Holiday a clear plastic baggy under the bottom of the bathroom stall. He could see the entire plastic bag, in other words, it was not bunched up in defendants' hands. Bracht testified that "at the time, I didn't know what it was . . . [but] suspected it to be some sort of CDS . . . based on prior experience and training." Both defendants then exited the stall and left the restroom within a few seconds of each other.

. . . .

Upon defendants' exit from the restroom, Bracht contacted his colleagues via cell phone and advised them of his observations. . . . Guarda then proceeded to the Cadillac to speak with the Londons, while Bracht and Holmes approached Holiday and Applegate at the Ford Ranger. Bracht knocked on the driver's side window, while Holmes knocked on the passenger window, and each announced himself as New Jersey State Police. Applegate was sitting in the driver's seat, with Holiday in the passenger seat, and both of them opened their windows. Both Bracht and Holmes smelled the odor of raw marijuana emanating from the interior of the vehicle. Applegate and Holiday were removed from the vehicle, placed under arrest, handcuffed, and read Miranda[1] rights. The troopers then searched the vehicle, and found a plastic bag containing suspected marijuana in the glove compartment. The search of Holiday recovered a clear plastic bag containing four bricks of heroin (200 wax folds) wrapped in rubber bands, from his coat pocket. . . . Bracht recognized that the bag recovered appeared to be the same as the bag that he observed in the bathroom. . . .

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

4

Tenreiro testified he photographed and measured the bathroom stall where Bracht observed the transaction.  McMahon visited the bathroom and with the help of other investigators attempted to re-enact the transaction.  The thrust of the defense witnesses' testimony was Bracht could not have observed the transaction by peering over his shoulder while standing at the urinal.  The judge reached the opposite conclusion.

She noted Tenreiro conceded it could be possible

> to see a hand-to-hand exchange under the stall while standing . . . .  For example, he admitted that one would be able to see under the stall door and divider in some of his pictures, that the exact location of the bag being passed within the stall was unknown, and that he could not be sure if his view was the same as he did not know exactly where Bracht was standing.

The judge noted McMahon "provided a very detailed description of the layout of the bathroom" but found

> [t]here were several variables that were unknown by this witness.  First, it was not known how close to the stall divider the hands of the assistants were placed relative to the floor, where there was an approximate [fourteen and one-half] inch gap from floor to the bottom of the stall divider.  The same measurement from stall divider to the floor as to the defendants and the bag that was allegedly passed was also unknown. Additionally, McMahon could not say where along the divider from front to back of the stall the actors and the defendants placed their hands.  . . . Of note, if the exchange occurred closer to the front of the stall rather

5

than the rear or rather than the apparent placement of the actors' hands, the court finds that it could have been visible to Bracht from his vantage point. . . . Without knowing the actors' squatting capabilities . . . , this measurement is difficult to determine.

The court also notes that while the actors held hands under the stall, based upon the testimony, they did not pass an object. . . . Bracht indicated that he saw the entire bag when it was passed, such that it could have been visible even below the hands (i.e., hanging down from their hands). While the court finds both of the defense witnesses credible and the efforts made to recreate the scene to be laudable, they could not and did not cover every potential line-of-sight from which . . . Bracht made his observations. In cross-examination, McMahon admitted that there were multiple variables relative to line-of-sight that were not known.

Defendant raises the following point on appeal:

POINT I — DEFENDANT'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES WAS VIOLATED WHEN TROOPER BRACHT FOLLOWED DEFENDANT INTO A PUBLIC REST ROOM AND PEERED AT HIM FROM BENEATH AN ENCLOSED BATHROOM STALL. AS A RESULT, THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE TROOPER BRACHT'S OBSERVATIONS WERE ILLEGAL AND DID NOT GIVE RISE TO THE REASONABLE SUSPICION THAT WAS NECESSARY TO JUSTIFY THE STOP OF DEFENDANT'S VEHICLE.

A-5708-18

Our review of a trial judge's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). In reviewing a motion to suppress evidence, we must uphold the judge's factual findings, "so long as those findings are supported by sufficient credible evidence in the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting Robinson, 200 N.J. at 15). Additionally, we defer to a trial judge's findings which are "substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Ibid. (alteration in original) (quoting Robinson, 200 N.J. at 15). We do not, however, defer to a trial judge's legal conclusions, which we review de novo. Ibid.

The Fourth Amendment of the United States Constitution, and Article I, Paragraph 7 of the New Jersey State Constitution, provide "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "[A] warrantless search is presumptively invalid" unless the State establishes the search falls into "one of the 'few specifically established and well-delineated exceptions to the warrant requirement.'" State v. Gonzales, 227 N.J. 77, 90 (2016) (citation omitted). One such exception is an investigatory stop. See Terry v. Ohio, 392 U.S. 1, 27

(1968); United States v. Hensley, 469 U.S. 221, 226 (1985) (finding police officers may stop a motor vehicle and detain its occupants temporarily while they investigate a criminal offense).

To subject a person to an investigatory stop and detention, however, the police must have a reasonable, articulable suspicion of conduct which violates the law. State v. Bernokeits, 423 N.J. Super. 365, 371-72 (App. Div. 2011). "The United States Supreme Court has defined reasonable suspicion as 'a particularized and objective basis for suspecting the person stopped of criminal activity.'" State v. Stovall, 170 N.J. 346, 356 (2002) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). The reasonable suspicion standard is far lower than probable cause, ibid., and is determined by objective "cumulative factors in a totality of the circumstances analysis[.]" State v. Elders, 192 N.J. 224, 250 (2007). Therefore, a police officer may conduct an investigatory stop if, based on the totality of the circumstances, there is reasonable "suspicion to believe an individual has just engaged in, or is about to engage in, criminal activity." State v. Maryland, 167 N.J. 471, 487 (2001) (citing Terry, 392 U.S. at 21).

Defendant argues the judge erred because Bracht lacked reasonable suspicion to follow him into the restroom and peer at him from beneath the

bathroom stall door, and later stop and search defendant at the vehicle. Defendant asserts he had an expectation of privacy in the bathroom stall.

In State v. Boynton, we held:

> It is generally accepted that individuals are due some degree of privacy in a public rest room. Due to the nature of the events that take place there, this finding is axiomatic. However, the design and use of the rest room has an effect on the degree of privacy accorded. . . .
>
> . . . .
>
> The use of a stall in a public restroom affords a greater degree of privacy but not an absolute one. When a stall is equipped with a door, the general rule seems to be that individuals in the stall are accorded a reasonable expectation of privacy, unless they are engaged in illegal activity that is apparent to the casual observer who is rightfully in a common area of the rest room. E.g., United States v. White, 890 F.2d 1012 (8th Cir. 1989), (no reasonable expectation of privacy for illegal activity that could be viewed under the stall door)[,] cert. denied, 497 U.S. 1010 (1990) . . . .
>
> [297 N.J. Super. 382, 388-89 (App. Div. 1997) (citations omitted).]

In Boynton, we adopted factors developed by the Washington Court of Appeals which we found "instructive" to discern the level of privacy accorded to a public restroom, namely,

> (1) society's belief that certain areas are ordinarily understood to afford personal privacy; (2) the character

9

of the area in which the claimed privacy interest is asserted; (3) the way in which the area is used; and (4) the method, means, or manner by which the government agents intrude in the area.

[Id. at 390-91 (quoting State v. Berber, 740 P.2d 863 (Wash. Ct. App. 1987)).]

Pursuant to these principles and our limited scope of review of a trial court's factual findings, we affirm substantially for the reasons expressed in Judge Flynn's thorough opinion. We add the following comments.

At the outset, we note Bracht was lawfully in the restroom. Pursuant to Boynton, once defendant entered the restroom stall, we have little doubt he had an expectation of privacy. However, the expectation that defendant would utilize the stall for toileting, changing his clothes, or some other personal reason did not credibly extend to engaging in an illegal drug transaction, including the passing of a baggie of heroin from one stall to another. Bracht gave credible testimony explaining how he observed the transaction by peering over his shoulder without leaving the urinal or peering under the stall in a manner one might consider objectively intrusive.

Therefore, Bracht's observations provided ample reasonable suspicion to stop and search defendant in the parking lot. The judge's findings were supported by the sufficient, credible evidence in the record.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

11