■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RONALD GAMBLE, Appellant.—Judgment, Supreme Court, New York County (Stephen G. Crane, J.), rendered on or about May

20, 1985, convicting defendant, after a jury trial, of robbery in the first degree and robbery in the second degree, and sentencing him as a second violent felony offender to concurrent prison terms of 12½ to 25 years and 7½ to 15 years, reversed, on the law, the defendant's written statement and part of defendant's oral statement hereinafter described are suppressed, the conviction vacated, and the matter remanded for a new trial.

The defendant was convicted, after a jury trial, of robbery in the first degree and robbery in the second degree, and sentenced as a second violent felony offender to concurrent prison terms of from 12½ to 25 years and 7½ to 15 years.

The jury's verdict was amply supported by the evidence at the trial. The principal question on this appeal is raised by defendant's contention that the court erred in denying his motion to suppress inculpatory oral and written statements made by him, statements that the defendant asserts were elicited following his invocation of his right to counsel and in violation of his right to counsel.

On this appeal, the People properly acknowledge that under established law the defendant had invoked his right to counsel prior to his inculpatory statements, and that accordingly it was error to admit into evidence defendant's handwritten statement and that part of his oral inculpatory statement that followed a question by the arresting detective. However, the People contend that defendant's first statement, acknowledging his participation in the robbery for which he was convicted, was spontaneous and therefore admissible, and that under all the circumstances the admission of the latter portion of the oral statement and the defendant's handwritten confession was harmless error.

We agree that it was error to admit into evidence the defendant's handwritten statement and the latter part of his oral statement, but we do not agree that the introduction of the defendant's handwritten confession can be considered harmless error, notwithstanding the undoubted strength of the People's case. As to whether or not the defendant's preliminary acknowledgment of culpable participation in the robbery was spontaneous and hence admissible, a more difficult question is presented, a question complicated by a legally relevant divergence in the detective's trial testimony from that adduced at the hearing.

It is important to a clear understanding of the several issues raised that the evidence adduced at the hearing and the issues

arising from that testimony be considered separately from the issues presented by evidence presented at the trial, which, as already noted, differs in one legally relevant respect.

As developed at the hearing, Detective Clinton, assigned to the investigation of a robbery of a token booth that had occurred on April 8, 1984, took defendant into custody at about 3:00 P.M. on April 10, 1984, in a park at 117th Street and Seventh Avenue. Brought to a police van, the defendant was taken to the Transit Police headquarters at 370 Jay Street, Brooklyn. In the van he was handcuffed and the *Miranda* warnings were read to him from a form. The warnings, which the defendant said he understood, ended with the following question: "Now that I advised you of your rights, are you willing to answer questions without an attorney present?" The defendant said no.

At about 10:25 P.M., in the lineup room at Transit Police headquarters, and just before the defendant was to be viewed in a lineup by a victim of the robbery, the detective asked the defendant if he recalled having been advised of his rights earlier when first taken into custody, and the defendant answered yes. As later developed in the testimony of the detective, he gave this reminder to the defendant to explore whether or not the defendant was willing at that time to answer questions, and the detective concluded that the defendant was not willing. The defendant was then identified by the witness in the lineup. Shortly after the identification, and while the defendant was in the lineup room, the detective informed him that he had been identified, testifying that it was his invariable practice to inform persons in custody of the results of the lineup whether the person had been identified or not.

Several minutes later, estimated at one point as some 10 minutes, the detective, then in another room, was informed by another officer that the defendant wished to speak to him. The detective reentered the lineup room and the defendant told him that he was at the robbery, that he had participated because of financial need, and that he had been told by his accomplice that his role would be that of a lookout. The detective then asked the defendant what he did during the robbery and the defendant stated that when the others took some of the money, he carried away a bag containing money and tokens.

Thereafter, when the detective learned that an Assistant District Attorney would not be available to speak to the

defendant, he asked the defendant whether he would be willing to write his statement down on a piece of paper, which the defendant agreed to do. In addition, the detective testified that at some point during the oral statement, apparently after the original inculpatory statement, the defendant asked the detective if he could help him out, and that he responded that all he could do was to tell the District Attorney that the defendant had willingly given the oral and the written admission to him.

In arguing for suppression, the single ground relevant on this appeal urged by defendant's trial counsel was that defendant's refusal to answer questions after the *Miranda* warnings constituted the assertion of his right to silence, and that right was not scrupulously honored in accordance with the applicable rules of law *(see, People v Ferro,* 63 NY2d 316) when statements were made by him after he was told that he had been identified, and without a repetition of the *Miranda* warnings. Responding to the issue presented by defense counsel, the trial court concluded that the detective did not violate defendant's rights when he informed the defendant that he had been identified, that the detective had no obligation thereafter to refuse to hear the defendant's volunteered statement, and that under the circumstances presented the failure to readminister the *Miranda* warnings did not require suppression of either the oral or the written statement.

On the basis of the hearing minutes, and in terms of the issue presented to the trial court by defendant's trial counsel, we agree with the trial court that defendant's right to have his claim of silence scrupulously honored was not violated when the detective informed him of the identification, and that the defendant's preliminary volunteered statement, not responsive to any question, was properly admissible. A closer question is undoubtedly raised as to whether or not it was appropriate in terms of the issue presented to the trial court for the detective to ask defendant for further details, and to have invited him to write out a written statement without repeating his *Miranda* rights. In view of the undoubted fact, conceded on this appeal by the People, that defendant's right to counsel was violated by the admission of statements made in response to questions or requests by the detective, it is unnecessary for us to determine whether or not the trial court was correct in his ruling in terms of the issue that was presented to him.

As already noted, on this appeal the defendant appropriately alleges that his negative answer when asked whether he

was "willing to answer questions without an attorney" constituted the assertion of his right to counsel *(see, People v Carmine A.,* 53 NY2d 816). The principle is now well established that "an uncounseled waiver of a constitutional right will not be deemed voluntary if it is made after the right to counsel has been invoked" *(People v Cunningham,* 49 NY2d 203, 205). From these principles it clearly follows that the oral statements made by the defendant in response to a question or questions by the detective, and the written confession, then made at the detective's request, were improperly admitted into evidence and must be suppressed.

The single remaining question in terms of the evidence adduced at the hearing is whether or not the defendant's first statement, apparently not made in response to any question, was spontaneous within the meaning of the single exception to the admissibility of inculpatory statements made after a defendant in custody has invoked the right to counsel. The issue is not free from doubt. The Court of Appeals has emphatically stated that "the spontaneity has to be genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed" *(People v Maerling,* 46 NY2d 289, 302-303; *People v Lucas,* 53 NY2d 678; *People v Carmine A., supra).* Recognizing the stringent nature of this test, we are not persuaded that the detective's statement to the defendant after the lineup that he had been identified, a statement that the detective testified was in accordance with his invariable practice to inform persons in custody of the lineup result, whether the person was identified or not, is correctly evaluated as a form of inducement and encouragement.

Accordingly, on the basis of the evidence adduced at the hearing, we are satisfied that the preliminary statement of the defendant described above was properly admitted in evidence.

A separate, and quite difficult, issue with regard to the spontaneous character of the defendant's first inculpatory statement is raised by the arresting detective's trial testimony. He testified that when he entered the lineup room to speak to the defendant after being told that the defendant wanted to say something to him, the following conversation occurred: "I asked him, I said do you want to say something to me? He said that if he cooperated with me, could I help him out. At that time I told him it all depends on what he was saying, and I could speak to the District Attorney in his behalf." He then testified to the defendant making essentially the same preliminary inculpatory statements that he testified

to at the hearing. In short, Detective Clinton's trial testimony is explicit that the defendant's inquiry as to whether the detective could help him if he cooperated, and the detective's response, occurred prior to the defendant's first inculpatory statement, whereas his hearing testimony strongly communicated that the exchange occurred thereafter.

Preliminarily, we agree with the People that this change in testimony does not affect the trial court's ruling after the pretrial hearing on the basis of the testimony then presented to the Trial Judge, at least in the absence of any application to the court by defendant's trial counsel to reopen the hearing or to reconsider his finding in the light of this change in testimony. However, this does not eliminate as an issue for appellate consideration the legal question raised by the detective's trial testimony. Defendant's several inculpatory statements were in fact admitted at the trial, and the issue as to whether those statements were in accord with defendant's constitutional rights was submitted by the trial court to the jury for its consideration. Although defense counsel did not identify the changed testimony as giving rise to a new issue as to whether the defendant's right to counsel had been violated, the principle is of course firmly established that a violation of the right to counsel may be reviewed in the absence of an objection. (See, People v Carmine A., supra, at 818; People v Ermo, 47 NY2d 863, 865.)

Addressing the issue raised by the trial testimony on the merits, as already observed, the Court of Appeals has carefully defined "spontaneous" in the relevant constitutional context as "genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed". In the light of this controlling definition, it may no doubt be argued with some logic that the defendant's inquiry with regard to help in the event of his cooperation should have alerted the detective, if he had been familiar with the relevant appellate authorities in this area, that the defendant was considering making an uncounseled waiver of his right to counsel, and that the detective's response, although truthful and neutrally phrased, could have encouraged the defendant to make such an unpermitted waiver.

Although apparently logical, this approach does not seem to us to be required by the controlling authorities, nor do we think that it represents a sensible response to the realities of the situation. The defendant clearly had a legitimate interest in learning what benefits might accrue to him if he were to cooperate. We see no persuasive reason why the detective

could not respond to this appropriate inquiry, so long as the response was truthful and neutrally phrased, as it was in this case, and so long as it did not give rise to a further colloquy that would justify the implication that the detective was engaged in a form of disguised interrogation.

Although there is language in some cases that provides arguable support for a contrary view, we believe that the admissibility of the first inculpatory statement by the defendant is consistent with the approach set forth in the most immediately relevant decisions of the Court of Appeals, and that it represents the sounder approach to the undeniably difficult issue that is here presented (see, People v Lynes, 49 NY2d 286; People v Huffman, 61 NY2d 795).

We do not understand the word "spontaneous" as used by the Court of Appeals to be limited to a sudden, unexpected statement by the defendant, or to exclude a statement that is obviously the product of some thought by the defendant. We think that the definition of spontaneous set forth in the several decisions on the question is complied with by a statement that is truly voluntary and that is "not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed." Concur—Sullivan and Kassal, JJ. Sandler, J. P., concurs in the majority writing for the court and concurs separately in a memorandum and Milonas, J., dissents in part in a memorandum, both as follows:
Sandler, J. P. (concurring).

I am in agreement with the result reached in the court's memorandum for the reasons there set forth. One aspect of the case seems to me, however, to merit separate discussion. I refer to that rule, important to the decision in this case, which regards as an assertion of the right to counsel a refusal to answer questions after the administration of Miranda warnings, where those warnings are followed by a question to the person in custody as to whether he was "willing to answer questions without an attorney present". (People v Carmine A., 53 NY2d 816, 818; People v Dean, 47 NY2d 967; People v Clark, 45 NY2d 432.)

Although it is, and should be, done rarely, I think there are circumstances in which an intermediate appellate Judge, without any disrespect to the Court of Appeals, may appropriately invite that court to reconsider the correctness of a rule it enunciated. The above-stated rule seems to me to represent such a situation.

A distinction has now been firmly established in the law of

this State between the consequences that follow the request of a person in custody for counsel and those that follow the assertion by such a person of his right to remain silent. As noted in the court's memorandum opinion, the uncounseled waiver of a constitutional right by a suspect in custody who has requested the assistance of counsel "will not be deemed voluntary if it is made after the right to counsel has been invoked" *(People v Cunningham,* 49 NY2d 203, 205). Where counsel has been requested, the only statements by such a person that may be admitted in evidence against him are spontaneous statements as that term was defined in the authorities cited in the court's memorandum opinion.

Where, however, a person in custody has refused to answer questions after receiving the *Miranda* warnings, thereby asserting his right to silence, his right to remain silent must be "scrupulously honored" *(Miranda v Arizona,* 384 US 436, 479; *Michigan v Mosely,* 423 US 96, 103-104; *People v Ferro,* 63 NY2d 316). As elaborated by the Court of Appeals in the leading case on this issue: "He may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime [citations omitted], but a statement volunteered or spontaneously made will not be suppressible unless it is about the same crime and results from express questioning or its functional equivalent under circumstances which do not include fresh warnings and do not scrupulously honor the suspect's right to cut off questioning [citations omitted]". *(People v Ferro, supra,* at 322.)

In this case, we are confronted with an exception to the usual rule that treats a refusal to answer, after the receipt of *Miranda* warnings, as the assertion of the right to counsel. The exception that has been carved out holds that a refusal to answer amounts to a request for counsel, where, prior to that refusal and after giving the required *Miranda* warnings, the interrogator asked the defendant if he was "willing to answer questions without an attorney present".

With great respect, I am unable to perceive a persuasive reason for giving that special meaning to the explicit use of the words "without an attorney present". What becomes immediately clear from a study of the *Miranda* warnings is that the words "without an attorney present" simply make explicit that which, in the absence of the words, is clearly implicit and manifestly intended and understood. Thus, in the *Miranda* warnings proper, as read to this defendant from the form, the following was included: "You have the right to consult with an attorney before speaking to the police and

have an attorney present during any questioning now or in the future. Do you understand? He said yes. If you cannot afford an attorney, one will be provided for you without cost. Do you understand? He said yes. If you do not have an attorney available, you have the right to remain silent until you have the opportunity to consult with one. Do you understand? He said yes."

Assume that the warnings were then followed by the detective asking the defendant in the more usual way: "Now that I advised you of your rights, are you willing to answer questions", omitting the words "without an attorney present". It is reasonable to suppose that the defendant would not have understood that he was being asked a question with precisely the same meaning as the question actually asked, which included the words "without an attorney present"?

In short, it seems to me that a negative response to the *Miranda* warnings by a suspect in custody always means that he does not wish to answer questions without an attorney present, whether or not that phrase, adapted from one of the *Miranda* warnings, is explicitly included in the last question put to the suspect. On the basis of this analysis, a question that would logically follow is whether or not a negative response to the *Miranda* warnings should always be interpreted as an assertion of the right to counsel. Such an approach would, of course, overthrow the principle established by the Supreme Court in *Michigan v Mosley* (423 US 96, *supra),* and one that has been consistently followed by the Court of Appeals.

Although there is undeniably an element of verbal ambiguity in the meaning of a negative response to the *Miranda* warnings, it seems to me that in terms of the reality of the situation, such a response is more realistically evaluated as the assertion of the right to silence than as a request for counsel. Particularly in light of the careful delineation by the Court of Appeals in *People v Ferro (supra)* of the rights of defendants who have asserted a claim to silence, I see no reason to fear that such an approach would impermissibly diminish the legitimate constitutional rights of such defendants. On the other hand, it would have the significant advantage of providing some flexibility to law enforcement officials in situations in which changing developments in the course of the investigation make it appropriate to ascertain if the defendant has changed his mind.

What seems to me particularly disturbing about the rule

that has been established is that it imposes an investigative limitation on police officers as the result of the use of a formulation, not required by law, that clearly represents an effort to be as fair as possible to the suspect in custody. The inevitable effect of the rule is to discourage law enforcement officials from using what is in fact preferable language in terms of the spirit of the *Miranda* warnings, and discourages them from so doing without, in my opinion, an adequate basis.

So far as I am able to determine, the rule has its genesis in *People v Clark* (45 NY2d 432, *supra),* which was decided at a time when the Court of Appeals had not explicitly determined what, if any, distinction should be made between the consequences of a request for counsel and the assertion of the right to silence, and in a case in which it made no difference to the result which principle was found to have been violated. Accordingly, no occasion was then presented to the court for a careful study of the question.

In any event, I believe that the rule merits another look by the Court of Appeals.

Milonas, J. (dissenting in part).

Defendant was convicted, following a jury trial, of robbery in the first and second degrees and sentenced, as a second violent felony offender, to concurrent prison terms of from 12½ to 25 years and from 7½ to 15 years as the result of an incident which occurred on April 8, 1984. On that date, defendant and another man, Raymond Gilliard, approached Ruth Clinton, the token booth clerk of the subway station at 135th Street and Eighth Avenue in Manhattan. The two men threatened Clinton with a gun as she was emptying the turnstiles and demanded access to the token booth. After Clinton's co-worker, Daryl Artis, opened the booth door, Gilliard ordered the two clerks to the floor, holding them there at gunpoint. In the meantime, defendant filled an attaché case with tokens and currency. Then the two men fled the scene.

Clinton provided the police with descriptions of the men who had robbed her, and identified Gilliard in a photo array. According to the evidence elicited at the hearing held in connection with the motion to suppress, two days later Detective John Clinton located defendant in a park. The officer identified himself and requested that defendant accompany him to a police van, explaining that the latter was a suspect in a token booth robbery. When they were inside the van, Detective Clinton read him the *Miranda* warnings from the bottom of an arrest sheet which he carried. In response to the

last question, "Now that I have advised you of your rights are you willing to answer questions without an attorney present", defendant said "No".

Defendant was thereafter escorted to Transit Police headquarters in Brooklyn. They arrived at the office at approximately 5:00 to 6:00 P.M., some 2½ to 3½ hours after the encounter in the park had first occurred. Since there were no cells, defendant was taken to a lineup room where he was kept handcuffed to a bar during at least a part of his stay. At about 10:30 P.M., Detective Clinton visited the defendant. "I wanted to see at that time if he changed his mind and he wanted to make any kind of statement at all." Detective Clinton did not repeat the *Miranda* warnings but said, "You know I've given you your rights before?" Defendant stated that he remembered. Detective Clinton testified that at that point, "Well, after we spoke he stood there and looked at me and I told him that he was going to have to go in and stand in a line-up at that time and he said he was ready; so I felt he wasn't going to tell me anything so I brought him into the room." Defendant took a position in the lineup, and Ruth Clinton, one of the token booth clerks, identified him as a perpetrator of the robbery.

Detective Clinton testified that it was a standard practice of his to notify suspects of the results of the lineup. Thus, about 7 to 8 hours after receiving his *Miranda* warnings, the officer informed defendant that he had been positively identified and formally arrested him for the April 8th token booth robbery. At that point, Detective Clinton left the lineup room, while defendant remained behind in the company of other officers. The record is silent as to what conversations took place between the defendant and the officers present. Three to five minutes later, Detective Clinton was apprised by another officer that defendant wished to speak with him. Detective Clinton returned to the lineup room and, without readministering the *Miranda* warnings, engaged in a conversation with defendant in the course of which the latter admitted his presence during the robbery in question. He claimed that he needed money and that Gilliard had suggested that he could earn some money by acting as a lookout. Detective Clinton asked defendant to describe his role in the robbery, and defendant conceded that he had carried a bag of money and tokens from the subway station. However, he denied having possessed a gun.

At Detective Clinton's urging, the defendant agreed to furnish a written statement. The officer also requested that

defendant note that he had been advised of his rights. It was Detective Clinton's further testimony that in the process of making his oral confession, defendant solicited the officer's assistance and he—Detective Clinton—responded that since defendant "willingly gave the oral and written admission", the officer would talk to the District Attorney on defendant's behalf. Detective Clinton also asserted that defendant received no promises and was neither threatened nor physically abused.

It should be stated that the account provided by Detective Clinton at trial regarding what occurred after he was summoned back to the lineup room differed in at least one particular from the version offered by him at the suppression hearing. At trial, Detective Clinton claimed that, prior to his confession, defendant had requested the officer's assistance in exchange for his cooperation. "I entered the line-up room. I asked him, I said do you want to say something to me? He said that if he cooperated with me, could I help him out. At that time I told him it all depends on what he was saying, and I could speak to the District Attorney in his behalf." However, the facts educed at the hearing indicate that there was a discussion of official intervention on defendant's behalf "during the oral admission". At any rate, based upon the evidence available from the *Huntley* hearing, the court denied defendant's motion to suppress his statements, finding that Detective Clinton's conduct could not be considered the functional equivalent of interrogation, and, therefore, defendant's admissions were spontaneous.

On appeal, the People concede that a portion of defendant's oral admissions and the ensuing written statement were unlawfully obtained by Detective Clinton and should have been suppressed. In that regard, the prosecution contends that defendant began his confession spontaneously but that at some point during his conversation with the officer he asked for help. Detective Clinton told defendant that since he had cooperated, the officer would speak to the District Attorney on his behalf. According to the People, through this discussion, Detective Clinton encouraged defendant to make further admissions. Thus, that part of defendant's statement which followed such exchange between him and the officer was improperly procured. However, if Detective Clinton's statement at trial as to when the defendant asked for his help is considered to clarify his hearing testimony, then clearly the People's concession applies equally to the defendant's oral statement as well. The People also assert that while it is true

that defendant's oral admission that he carried a bag of tokens and currency from the station and his subsequent written confession were both taken in violation of his constitutional rights, their introduction into evidence constituted harmless error.

At the outset, it is important to point out that once a suspect invokes his right to remain silent, as occurred in the instant situation, he may not within a short period thereafter and without readmininstration of the *Miranda* warnings be questioned about the same alleged crime. *(People v Ferro,* 63 NY2d 316; *Michigan v Mosley,* 423 US 96.) However, a "statement volunteered or spontaneously made will not be suppressible unless it is about the same crime and results from express questioning or its functional equivalent under circumstances which do not include fresh warnings and do not scrupulously honor the suspect's right to cut off questioning" *(People v Ferro, supra,* at 322).

Defendant argues, and the prosecution agrees, that by answering "no" to Detective Clinton's inquiry concerning whether he wished to speak without the presence of an attorney following receipt of the *Miranda* warnings, defendant had invoked his right to counsel. *(See, People v Carmine A.,* 53 NY2d 816.) A suspect in custody who requests the assistance of counsel may not be questioned further in the absence of a lawyer. *(People v Cunningham,* 49 NY2d 203.) As the Court of Appeals explained therein, "a waiver of a constitutional right will not be deemed 'voluntary' unless the police have 'scrupulously honored' the suspect's prior assertion of his rights" *(supra,* at 207). If a person in custody who has invoked his right to counsel does, nonetheless, then make a statement, admissibility depends upon whether it was spontaneous or the product of "express questioning or its functional equivalent". *(People v Ferro, supra,* at 322; *People v Huffman,* 61 NY2d 795; *People v Bryant,* 59 NY2d 786; *People v Lanahan,* 55 NY2d 711; *Rhode Island v Innis,* 446 US 291.)

To be considered spontaneous, a statement must be "genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed. For such interrogation tactics often may be more destructive of a defendant's rights than are blatantly coercive techniques." *(People v Maerling,* 46 NY2d 289, 302-303; *see also, People v Rivers,* 56 NY2d 476; *People v Lanahan, supra; People v Carmine A., supra; People v Lucas,* 53 NY2d 678.) Although the police are not required "to take affirmative steps, by gag or otherwise, to prevent a talkative person in custody from

making an incriminating statement" *(People v Rivera, supra,* at 479), it "is not sufficient that the statements were found to have been voluntary and not in response to express questioning by the police. To entitle these statements to receipt in evidence it must at least be shown that they were in no way the product of an 'interrogation environment', the result of 'express questioning or its functional equivalent' " *(People v Stoesser,* 53 NY2d 648, 650; *see also, People v Lucas, supra; People v Grimaldi,* 52 NY2d 611). Indeed, the standard for evaluating the spontaneity of a suspect's statement is whether it was "made without apparent external cause, i.e., self-generating." *(People v Stoesser, supra,* at 650.) The statement must consist of a blurted-out admission "which is in effect forced upon the officer" *(People v Grimaldi, supra,* at 617; *see also, People v Lucas, supra).*

In the present case, Officer Clinton claimed at the hearing that some 3 to 5 minutes after informing defendant that he had been identified in the lineup and was, therefore, under arrest, he was summoned back by defendant to the room in which the latter was being held. Defendant thereafter purportedly admitted that he was present during the robbery of the 135th Street subway station. Yet, the rights to counsel and against self-incrimination are so fundamental that this court cannot ignore the fact that, at trial, Detective Clinton testified that defendant's admissions were not offered until after the two of them had engaged in a conversation with respect to whether defendant could rely upon the officer's assistance in exchange for his cooperation. Certainly, this was no blurted-out admission or a self-generating confession.

As the Court of Appeals has explained in *People v Ferro (supra,* at 319), the interrogation of a suspect who, after having received *Miranda* warnings, has declined to answer questions is defined "not by the subjective intent of the police, but by whether an objective observer with the same knowledge concerning the suspect as the police had would conclude that the remark or conduct of the police was reasonably likely to elicit a response." Even disregarding Detective Clinton's altered trial version of events, and limiting oneself to the evidence available to the hearing court, the People have failed to demonstrate that defendant's initial admission was blurted out or self generating and not the product of an "interrogation environment" or police conduct conducive to evoking a response. There is nothing in the record herein to indicate that when Detective Clinton returned to the room in which defendant was being detained, defendant immediately, and without

a further exchange of words with the officer and without affording the latter a chance to provide a new set of *Miranda* warnings, forced upon Detective Clinton an admission. The evidence is, rather, to the contrary, since an examination of the minutes reveals that Detective Clinton encouraged defendant to talk and made no effort to readminister the *Miranda* warnings despite having ample opportunity to do so. Consequently, defendant's oral admissions should have been suppressed in their entirety, along with his written confession.

Finally, I agree with the majority that a reversal is also mandated based upon the People's own concession that the written confession should not have been admitted into evidence. The use of an unlawfully obtained written statement at trial even where the statement merely reiterates properly obtained oral admissions, cannot be deemed harmless error. *(People v Schaeffer,* 56 NY2d 448; *People v Garofolo,* 46 NY2d 592; *see also, People v Prince,* 50 NY2d 883.)

Therefore, the judgment of the Supreme Court, New York County (Stephen Crane, J.), rendered on or about April 24, 1985, convicting defendant, following a jury trial, of robbery in the first degree and robbery in the second degree and sentencing him, as a second violent felony offender, to concurrent prison terms of from 12½ to 25 years and 7½ to 15 years, should be reversed, on the law and the facts, defendant's oral and written statements suppressed, the conviction vacated, and the matter remanded for a new trial.