OPINION OF THE COURT
Dominic R Massaro, J.
The principal issue to be resolved on this reconsideration is whether use of a toilet stall in a public restroom at a prison facility gives rise to a subjective expectation of privacy that society accepts as objectively reasonable. The court holds that it does not, and that governmental intrusion in this limited context is not constitutionally prohibited by the Fourth Amendment Search and Seizure Clause. The reported cases provide no guidance with respect to the unique fact pattern presented here.
*545 An indictment has been filed against the defendant charging him with promoting prison contraband in the first degree (Penal Law § 205.25 [1]) and criminal possession of a controlled substance in the seventh degree (Penal Law § 220.03).
The defendant, in turn, claims to be aggrieved by an unlawful or improper acquisition of evidence. His concern is not unwarranted that such evidence may be offered against him in the pending criminal action, and he makes the instant motion for an order of suppression based upon factors precluding admissibility.
The defendant further moves to suppress certain oral and written statements made by him after being taken into the custody of the New York City Correction Department.
Following a combined Huntley-Mapp hearing granted by the court, the People conceded that the defendant’s statements should not be admitted into evidence. It is well settled that when a defendant answers "no” to the question of whether he is willing to speak to law enforcement officials without an attorney present, and, indeed, specifically requests an attorney as was done here, he thereby invokes the right of counsel (People v Carmine A., 53 NY2d 816 [1981]; People v Dean, 47 NY2d 967 [1979]; People v Gamble, 129 AD2d 470 [1st Dept 1987]). In each of the cases cited, a conviction was reversed because of continued questioning after the defendant had invoked this right. Accordingly, the Huntley branch of defendant’s omnibus motion, while otherwise moot, is well founded, and further discussion unnecessary.
With respect to the suppression of physical evidence, it is the accused, not the People, who must shoulder the burden of persuasion. The People have only the burden of going forward to show the legality of the police conduct in the first instance (People v Di Stefano, 38 NY2d 640 [1976]).
The pretrial suppression hearing was conducted on October 30, 1987 and November 2, 1987. Three witnesses were called by the People: Correction Officer John Koval, Correction Officer Jeff Gould, and Correction Captain Russel Martin. Two witnesses testified for the defense: Correction Officer Nanette Hafeez and the defendant, Alfred Saunders. Each officer was frank, candid and trustworthy. Their testimony, marked by no serious inconsistencies or contradictions, had the tone and flavor of credibility. Saunders’ testimony with respect to the purported use of the toilet stall was less so.
*546 FINDINGS OF FACT
On March 19, 1986, Officer Koval was working a 7:30 a.m. to 4:00 p.m. tour of duty at the Adolescent Reception Center on Rikers Island. His assignment was "security and search duty”. At approximately 11:40 a.m., a number of visitors arrived, and Officer Koval announced that if any were carrying contraband, "any kind of dangerous drugs, such as heroin, marijuana, cocaine,” they would have an opportunity to place said contraband into a provided "amnesty box” with "no questions asked.” Thereafter, Koval proceeded to search the visitors, including the defendant, as each passed into the visitor registration room.
In searching the defendant, Officer Koval discovered what appeared to be a substantial sum of cash being carried in a duffel bag; Koval testified that he neither counted nor seized the money.
The defendant, together with the other visitors, took a seat in the registration room. Koval continued to observe the defendant "acting nervous,” and noted that Mr. Saunders held his duffel bag "on his lap tightly secured.” When Mr. Saunders’ name was called by another correction officer, he proceeded to the visitor registration desk, where he identified himself. Arrangements were made to produce the inmate whom he was visiting to the appropriate area inside the prison complex. The defendant was informed of locker facilities in the registration room for the deposit of personal effects not permitted in the prison proper; he returned to his seat with all personal belongings.
At his option, the defendant was always free to leave the Reception Center and return to the street outside.
Officer Koval, meanwhile, began his security patrol. It consisted of a routine search of "the lockers, the bathrooms, the garbage cans” for items that may have been concealed by visitors. The toilet facilities are located in the same visitors’ area. As Koval was about to commence his searching activity, the defendant went to the men’s room. Within "five minutes” thereafter, Officer Koval opened the men’s room door and observed a person standing in 1 of 2 toilet stalls; the stall door was open — although the lock was apparently broken, the defendant testified that he made no attempt to secure the stall door — and said person’s back was turned toward Officer Koval. Koval heard the person make "a loud sniffing sound.” Though *547 Officer Koval was unaware of it at the time, the person standing in the stall was the defendant, Mr. Saunders.
Upon being inquired "What are you doing?,” the defendant turned around and faced the officer. Koval observed a quantity of white powder on the defendant’s face — more particularly, on his "nose, lip and mouth.” He requested that Mr. Saunders accompany him to Captain Martin’s office. The defendant complied, but while walking to the office, he dropped 13 small packets containing a white powder retrieved by Officer Koval. Subsequent laboratory analysis established this white powder to be heroin.
CONCLUSIONS OF LAW
I
The threshold consideration is whether, and to what extent, the defendant had any reasonable expectation of privacy in an open toilet stall in the visitors’ reception area of a correctional institution. Secondly, the court must consider whether Officer Koval’s conduct was unreasonably intrusive under the circumstances extant.
A citizen’s expectation of privacy has its roots in the strictures of the Fourth Amendment to the US Constitution which provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”
While the Fourth Amendment prohibits unreasonable intrusions only by the Federal Government, its protection is extended to unreasonable actions by the States through the Due Process Clause of the Fourteenth Amendment (Mapp v Ohio, 367 US 643 [1961], reh denied 368 US 871 [1961]). The New York citizen otherwise enjoys protection found at the Search and Seizure Clause of the State Constitution (NY Const, art I, § 12).
The purpose of the Federal and State clauses, then, is to protect individuals from unreasonable government intrusion into their legitimate expectations of privacy (United States v Chadwick, 433 US 1 [1977]; People v Mercado, 68 NY2d 874 [1986]). Manifestly, persons have a reasonable expectation of privacy in their homes, and a protected privacy right is *548 recognized in other confined areas as well (see, People v Mercado, supra, at 876).
In Katz v United States (389 US 347, 361 [1967]), Justice Harlan, in a concurring opinion, articulated the nature of one’s expectation of privacy: "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.’ ” The majority opinion of the court (Stewart, J.) noted that "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. * * * But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.” (Supra, at 351-352.)
A citizen’s right of privacy is not absolute, but it is protected against arbitrary and oppressive governmental intrusion. The determination whether police conduct is reasonable ultimately involves a balancing of the citizen’s right of privacy and society’s interest in the apprehension of a suspected lawbreaker (People v Cantor, 36 NY2d 106, 111 [1975]). Thus, "[t]he Fourth Amendment protects not against all searches and seizures but [only] 'against unreasonable, searches and seizures’ ” (People v Peters, 18 NY2d 238, 247 [1966]). In weighing these interests "we must consider first whether * * * the police action was justified in its inception and secondly whether * * * that action was reasonably related in scope to the circumstances which rendered its initiation permissible” (People v De Bour, 40 NY2d 210, 215 [1976]).
"The complex nature of urban society, with its propensity to serve as a breeding ground for crime, has focused attention upon societal needs in relation to individual liberties. The quest to reasonably protect the one without unduly infringing upon the other has impelled the courts to 'seek to balance society’s interest in the detection and prevention of crime and in the protection of the lives and safety of law enforcement officers with the interest of individuals in living their lives free from governmental interference. Therefore, whether there has been an unreasonable breach of legitimate expectations of privacy involves consideration of (1) the nature and scope or severity of the interference with individual liberty, (2) the public interest served, and (3) the objective facts upon which the enforcement officer relied, in light of his knowledge *549 and experience’ ” (People v Dean, 79 AD2d 555, 556 [1st Dept 1980]; see also, People v Alba, 81 AD2d 345 [1st Dept 1981]).
The United States Supreme Court similarly stated: "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted” (Bell v Wolfish, 441 US 520, 559 [1979]). The question of whether a particular level of intrusion is reasonable " 'must necessarily turn on the facts in each individual case’ ” (People v Prochilo, 41 NY2d 759, 761 [1977]).
II
In the instant case, the search occurred upon the grounds of a detention facility. A detention facility is recognized as a "unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence” (Bell v Wolfish, supra, at 559). In Black v Amico (387 F Supp 88 [WD NY 1974]), the court stated that the search of persons entering a jail facility is similar to a border search; that is, in both instances, the aim is to prevent contraband and other prohibited material from entering. Border searches have generally been deemed reasonable "simply by virtue of the fact that they occur at the border” (United States v Richards, 638 F2d 765, 770 [5th Cir 1981]; United States v Carter, 592 F2d 402, 404 [7th Cir], cert denied 441 US 908 [1979]).
Stated differently, " '[tjhere is reason and probable cause to search every person entering the United States from a foreign country, by reason of such entry alone’ ” (United States v Rivera-Marquez, 519 F2d 1227, 1228 [9th Cir], cert denied 423 US 949 [1975]). Thus, routine searches of persons and vehicles at our Nation’s borders are constitutionally permissible if supported by a "mere” suspicion of possible illegal activity (United States v Bowman, 502 F2d 1215 [5th Cir 1974]; United States v Warner, 441 F2d 821 [5th Cir], cert denied 404 US 829 [1971]; United States v Sandler, 644 F2d 1163 [5th Cir 1981]).
While holding border searches to be permissible even when supported by only a "mere” suspicion, the courts have placed limitations upon the scope of such a routine search. Thus, a *550 "strip search” of a person entering the country at its border cannot be justified unless supported by at least a " 'reasonable suspicion’ ” (United States v Sandler, supra, at 1166). A "reasonable suspicion” has generally been deemed to be that quantum of knowledge sufficient to induce an ordinary, prudent man under the circumstances to believe that criminal activity is at hand. A reasonable suspicion must be supported by articulable facts, which along with logical deductions, would reasonably prompt police intrusion (People v Cantor, supra, at 113).
Similarly, the reasonableness of searches of persons at a correctional institution or a detention facility must turn upon the nature of the search and its level of intrusiveness. This must be balanced against the institution’s legitimate need to maintain security and order. In attempting to strike such a balance, the United States District Court for the Western District of New York, in Black v Amico (supra), held that the strip search of a visitor to a jail is so degrading and embarrassing (i.e., intrusive) that it should be permitted only when other less offensive measures would not render the facility secure.
In Hunter v Auger (672 F2d 668 [1982]), the Eighth Circuit Court of Appeals held that strip searches of prison visitors violated the visitors’ Fourth Amendment rights where the prison authorities ordered the searches wholly on the basis of uncorroborated anonymous tips stating that the visitors would attempt to smuggle drugs to inmates. The court found that such anonymous tips did not give rise to the reasonable suspicion required to justify a strip search.
In Security & Law Enforcement Employees, 82 v Carey (737 F2d 187 [1984]), the Second Circuit Court of Appeals considered the constitutional propriety of subjecting correction officers to strip searches. That court held that such searches were proper, provided that the reasonable suspicion standard was satisfied by objective facts and rational inferences that the correctional authorities may draw from those facts in light of their experience. Such searches were found to be reasonable under certain circumstances in view of the fact that "in prisons there exists 'the ever-present potential for violent confrontation and conflagration’ ” (Security & Law Enforcement Employees, 82 v Carey, supra, at 202). Moreover, the court stated: "Clearly, the security problems faced by prison administrators are difficult, complex and challenging. Thus it is fundamental that we recognize the legitimate penological *551 imperatives of maintaining prison security and preserving internal order and discipline.” (Supra, at 203.)
In United States v Sihler (562 F2d 349 [1977]), the Fifth Circuit of the Court of Appeals upheld a less intrusive search of a prison guard, wherein a quantity of marihuana was found in his brown paper lunch bag. The court’s analysis upheld the seizure as the product of a "consent search” relying upon the fact that the prison had a sign posted advising that "all PERSONS ENTERING UPON THESE PREMISES ARE SUBJECT TO ROUTINE SEARCHES OF THEIR PERSON, PROPERTY OR PACKAGES” and that the defendant prison guard was aware of the fact that persons entering the prison were routinely searched.
In Bell v Wolfish (supra) the United States Supreme Court considered the constitutionality of visual body searches of prisoners following contact visits with outsiders. It held that such searches were reasonable and did not violate the Fourth Amendment.
HI
While the cases dealing with prison searches and border searches are instructive, none deal with the specific question presented herein, to wit, whether the correction officer’s entry into the public restroom, and his inquiry of the defendant was unduly intrusive and violative of the defendant’s right of privacy.
Clearly, one’s expectation of privacy while within the confines or even upon the perimeter of a correctional institution is less than such expectation would be outside the institution. Nonetheless, one cannot help but expect greater privacy within that institution’s visitors’ restrooms than in other parts of the institution; this because restrooms are normally used for the performance of functions not ordinarily exposed to public view. Indeed, it has been held that police surveillance of public restrooms is violative of the Fourth Amendment unless supported by probable cause or exigent circumstances (Kroehler v Scott, 391 F Supp 1114 [ED Pa 1975]; see also, Bielicki v Superior Ct., 57 Cal 2d 602, 21 Cal Rptr 552 [1962]).
Observation of illegal activity in the public areas of a restroom might constitute a reasonable intrusion, as " '[t]here is no justified expectation of privacy as to incriminating conduct which occurs in the public area of a restroom rather than inside one of the stalls’ ” (People v Milom, 75 AD2d 68, 70 [1st Dept 1980], quoting 1 LaFave, Search and Seizure § 2.4, at 346 [1978]). However, once the individual enters a toilet *552 stall within that restroom, his expectation of privacy is increased, and the probable cause standard applies. This is so even when the stall lacks a door (People v Triggs, 8 Cal 3d 884, 106 Cal Rptr 408 [1973]; Kroehler v Scott, supra). Thus, those cases in which the constitutionality of an intrusion into a toilet stall was upheld are cases in which probable cause for such intrusion was found (cf., People v Mercado, supra).
In the instant case, however, the court cannot overlook the fact that the toilet stall is in a prison; and finds it necessary to weigh the penological requisite for maintaining and insuring internal security therein, undoubtedly a legitimate interest of government, against the individual’s justifiable expectation of privacy under constitutional guarantees. Nor is the court unmindful both of the unique problems faced by prison administrators and the unquestionable risks to inmates, employees and the public alike from a breakdown of order in correctional institutions.
In balancing the competing interests and considering the totality of the circumstances presented for review, the court finds privacy is not so broad a fig leaf that covers minimal, almost inadvertent in the instant case, intrusion into what otherwise is a realm deserving of more encompassing protection (see generally, Tennessee v Garner, 471 US 1, 8 [1985], quoting Michigan v Summers, 452 US 692 [1981]; Delaware v Prouse, 440 US 648 [1979]; 1 LaFave, op. cit., § 2.1, at 234).
The Fourth Amendment protects "a society which chooses to dwell in reasonable security and freedom from surveillance” (Johnson v United States, 333 US 10, 14 [1948]). It does so by placing an objective standard between zealous government agents and private citizens.
Analysis under current Fourth Amendment jurisprudence, then, centers on the objective reasonableness of the particular government intrusion (Terry v Ohio, 392 US 1 [1968]). In deciding what is reasonable, the court now looks to and considers what prevailed at the point of encounter: a prison security officer, as part of his assigned duties, taking note of something evident to his sense of hearing. And while our courts have yet to recognize "plain sound” as a doctrinal development analogous to "plain view” as prior justification for an intrusion, here, especially in light of the unique set of facts on which the instant application turns, such intrusion remains within the ambit of acceptability.
On reflection, the standard to be applied is not that things *553 might have been accomplished differently; rather, the conduct always to be condemned must be so unreasonable that it is better to permit a guilty party to go free than to have a citizen subjected to a flagrant form of police behavior. The threshold for such objectionable conduct cannot be said to have been crossed in the case at bar. Likewise, it seems abundantly clear that the defendant could not reasonably have manifested the same expectation of privacy he otherwise might have enjoyed, and which, in turn, society could accept as reasonable in according him, in another restroom somewhere other than on prison grounds.
The notion that a prison setting affords the same guarantee of protection from warrantless police intrusion as the sanctity of the home and/or the privacies of life, on its face, is at odds with both common sense and reality.
Accordingly, defendant’s motion to suppress tangible evidence is, on reconsideration and in all respects, denied.