OPINION OF THE COURT
Ruth Pickholz, J.
I held a hearing to resolve defendant’s application to suppress physical evidence and identification testimony. Retired New York City Police Detective Jose Valentin, whose testimony I credit, testified for the People. The defendant presented no witnesses.
Findings of Fact
Detective Valentin was acting as the ghost officer in an undercover buy-and-bust operation in the Times Square area in the early morning hours on February 16, 2011. Valentin followed the primary undercover officer and a stocky person wear *252 ing a three-quarter length leather jacket for approximately 30 minutes as they wandered the neighborhood. The detective did not get a look at the stocky person’s face during this time. He observed the two enter a DVD store just south of 39th Street on Eighth Avenue. A minute later the undercover officer came out of the store and signaled to Valentin that he had purchased narcotics. Valentin relayed the information to the other members of the team and they all entered the store. There were few patrons at that hour. No one on the first floor remotely resembled the stocky person, so Valentin proceeded up to the third floor while the remaining members of the team searched the second floor. Finding no one who resembled the stocky person, Valentin went down to the second floor. He saw a person in a lounge area who was clearly not the person he was looking for. Beyond it was a row of 8 to 10 small one-person booths designed for the viewing of pornographic videos. The booths had six- or seven-foot-high doors which almost reached the floor and which could be locked. All but two of the booths were empty, their doors ajar. The doors of the other two booths were closed. Valentin approached the first booth with a closed door. He could not see who was inside. The door was apparently unlocked, and without knocking he opened it and directed the person who was in the booth to come out. Valentine observed a leather jacket on the floor of the booth as well as a knapsack, but even after the man (defendant) was outside next to him, he was not certain that he was the person that he had observed for 30 minutes. The detective then went to the second booth and ordered the occupant out. When he saw that this person was slender and wore dreadlocks, he let him go on his way. He took defendant outside the store, where the primary undercover officer, standing a car-length away, identified him as the person who had sold drugs to him. The police then searched the defendant and recovered $46 in cash. They also seized the black leather jacket and the knapsack that had been on the floor of the booth.
Conclusions of Law
The issue before me is whether the police were justified in opening the door of a closed video booth in an adult video store in order to ascertain whether the occupant was the person who had engaged in a drug sale 5 or 10 minutes earlier. The defendant argues that the police did not act lawfully because he had a reasonable expectation of privacy in the booth.
A person may claim a reasonable expectation of privacy in an area if he has demonstrated an actual, subjective expectation of *253 privacy there, and if that expectation is objectively justifiable, i.e., if society recognizes that expectation as reasonable (see Katz v United States, 389 US 347 [1967]; People v Mercado, 68 NY2d 874 [1986]). The latter inquiry is generally answered by looking at the nature of the activity involved (Kroehler v Scott, 391 F Supp 1114 [1975]; People v Diaz, 85 Misc 2d 41 [1975]). Those activities which require a person to disrobe or which involve private bodily functions fall within those that society will afford privacy. Thus, a person has a reasonable expectation of privacy in a toilet stall (see People v Mercado, 68 NY2d 874 [1986]). In Mercado, an unidentified man told police officers that two men were occupying a single toilet stall in an airport terminal. A police officer then entered the restroom and overheard two male voices from the stall (although he could only see one pair of feet). The officer stood on the commode of the adjoining stall and observed the two men, one holding an open glassine envelope of white powder. He searched the men after ordering them out of the stall and discovered bags of heroin on the person of defendant. The Court of Appeals held that a person has a reasonable expectation of privacy in a toilet stall in a public restroom, as “[t]he enclosure exists precisely to insure privacy and to shield its occupant from public view. Once the door is closed, an individual is entitled to assume that while inside he or she will not be viewed by others” (id. at 876 [citations omitted]). Similarly, a person also has a reasonable expectation of privacy in a bedroom, fitting room or changing room (see People v Evans, 27 AD3d 905 [2006]; People v Diaz, 85 Misc 2d 41 [1975]; Penal Law § 250.45).
It is as reasonable to expect privacy in a closed video booth in an adult book or video store as it is in a bathroom stall. Video booths exist solely in adult book and video stores. Their purpose is to permit patrons to afford privacy to viewers of adult videos.* Society considers the activity that viewers commonly engage in while watching videos of this type to be as private as the activities engaged in by those using toilet stalls and fitting rooms. Were someone to engage in such activity in a public area, he could be prosecuted for public lewdness or exposure of his person (Penal Law §§ 245.00, 245.01). Even where this is not the case, privacy is afforded to the person who wishes nothing more than the opportunity to view the type of adult video he *254 may favor away from censorious or prying eyes. In either case, the occupant expects that he will have privacy while he is inside the booth, and I find that such expectation of privacy, at least in a booth like the one before me which excludes outside viewers, is reasonable (see Wilkins v State, 829 SW2d 818 [Tex App 1992]; Liebman v State, 652 SW2d 942 [Tex Crim App 1983]; cf. State v Lawson, 103 Haw 11, 78 P3d 1159 [2003]).
The People put forth several arguments in support of their contention that the defendant lacked a reasonable expectation of privacy in the booth in this instance. These arguments are primarily based upon the fact that he did not lock the door of the booth. Their major argument is as follows: Public areas of commercial premises are not afforded Fourth Amendment protection, and the police have the right to enter such premises to make observations. Observing someone walk into a video booth is no different from watching him walk into a public movie theater that plays adult movies, in that in each case the observer is aware that the customer is about to watch an adult video. The only activity that is compromising is the act of walking into the theater or booth, which is open to public view. What transpires in the theater or booth, i.e., the viewing of an adult video, is a foregone conclusion. Recognizing, without conceding so explicitly, that it is not uncommon for viewers of adult videos to masturbate while viewing them, the People argue that defendant could not have lawfully done so in this case because, as he did not lock the door, anyone could have entered the booth to observe him. As the only lawful activity in which he would have engaged while in the unlocked booth was watching a video, and as that act is no more intimate or personal an activity than watching an adult movie in a public movie theater, the defendant in the case before me lacked a reasonable expectation of privacy.
I reject the argument that defendant did not have an expectation of privacy in the booth because he did not lock the door. The absence of a lock is not a determinative factor in deciding whether a person has a reasonable expectation of privacy in an area (see People v Mercado, 68 NY2d 874 [1986]). “Once the door is closed, an individual is entitled to assume that while inside he or she will not be viewed by others” (id. at 876 [emphasis added]). In this case, the testimony did not suggest that the door was not fully closed. Furthermore, a major thrust of the case law is that the expectation of privacy is created by the nature of the activity involved, not the precise physical *255 characteristics of the enclosure (see People v Diaz, 85 Misc 2d 41 [1975]; Brown v State, 3 Md App 90, 238 A2d 147 [1968]; Kroehler v Scott, 391 F Supp 1114 [1975]; State v Limberhand, 117 Idaho 456, 788 P2d 857 [1990]). Indeed, a person may even have a reasonable expectation of privacy in a toilet stall without a door as long as it is designed to afford privacy from public view (see People v Saunders, 140 Misc 2d 544 [1988]; People v Triggs, 8 Cal 3d 884, 506 P2d 232 [1973] [overruled on other grounds]). I see no reason to assume otherwise in the case of a video booth where the door is closed. Just as in the case of an occupant of a toilet stall in a public restroom, an occupant of a video booth would expect that another, seeing that the door was closed and suspecting that enclosure was in use, would not simply push the door open to use it. At the very least, societal mores would require him to announce his presence or knock to verify that it was in use. The People’s argument that defendant should not have expected that he had privacy because, they contend, someone could have peeked at him from outside by looking under the door is meritless for the same reasons. Additionally, the testimony establishes that the booth doors went “pretty much” “all the way down to the floor.” Viewing more than the occupant’s shoes by peering through the small opening between the door and the floor was therefore impossible. The People’s premise that watching an adult video in an unlocked video booth is no more intimate or personal an activity than watching an adult movie in a public movie theater is not compelling. Unlike an adult movie theater, a viewing booth is not a public place. In the former, passers-by on the street who observe the people entering as well as the people in the audience are aware of the content of the movie being shown. That is not the case in a closed video booth, where videos with a variety of sexual themes are available to the viewer. The viewer may therefore view a video that suits his tastes without others watching and free of the fear that he will suffer the opprobrium of others.
If a person has a reasonable expectation of privacy in an area, a visual inspection of that area is deemed to be a “search” (see People v Mercado, 68 NY2d 874 [1986]). “Once it is resolved that the particular locale is one in which there is a cognizable expectation of privacy, the invasion of that privacy — including a visual one — will be a search subject to constitutional strictures” (id. at 875). That a person may have a reasonable expectation of privacy does not shield him from investigation by the police, but *256 it requires that before they may negate the privacy interest, they must have a sufficient basis to do so and must act reasonably (id.). In Mercado, the Court of Appeals found that such a basis existed because the police had probable cause to believe that criminal activity was taking place in the stall:
“Human imagination might conjure up possible innocent behavior within that toilet stall — defendant has suggested only the presence of an ill or handicapped person — but that cannot be the test of probable cause justifying an intrusion upon one’s privacy interest. Probable cause does not require proof to a mathematical certainty, or proof beyond a reasonable doubt. Based on the articulated, objective facts before [the police officer] . . . and the reasonable inferences to be drawn therefrom, it was ‘more probable than not’ that criminal activity was taking place inside the stall” (id. at 877 [citation omitted]).
The court also noted that any criminal activity that was going on could abruptly terminate and any evidence disappear if the defendant discovered that the police were there. It concluded that the visual intrusion was therefore not unreasonable. Similarly, in People v Green (123 AD2d 715 [1986]) a robbery victim told police officers that three men who had robbed him on an earlier occasion were in a bar, and he gave detailed descriptions of each. The crime victim also mentioned that one of the men, wearing a long, light brown coat and a blue hat, was possibly armed. Police officers entered the bar five minutes later and observed two of the men that the victim had described and removed them. A third man, wearing a long, light brown coat and a blue hat, entered the restroom. When the police followed him in they saw that he was inside a stall. They opened the door to observe he was in possession of a gun. The Appellate Division, Second Department, reversed the trial court’s suppression of the gun, holding that, although the defendant had a reasonable expectation of privacy in the stall, “the information received by the police from the victim, when coupled with their own observations, provided them with a reasonable basis to enter the stall” (id. at 716). Thus, for the police to intrude upon a person in a public toilet stall, either probable cause or exigent circumstances must exist to justify the search (see Kroehler v Scott, 391 F Supp 1114 [ED Pa 1975]). As I find that the defendant had a reasonable expectation of privacy in the booth he was using, the same principle applies.
*257 Detective Valentin knew that the man that he had followed for the previous half hour had sold narcotics to the primary undercover officer, and that he was somewhere in the DVD store. Although he knew that the seller had a stocky build and was wearing a dark leather jacket, he did not know exactly what he looked like. Nevertheless, after he and his team went through the store he was able to eliminate from consideration all but the two people who were in the occupied video booths. It was therefore a reasonable deduction that the person he was seeking was one of them. As he viewed the closed booths, it was equally possible that the person he was seeking was in the first booth as the second. Under these circumstances Valentin did not have probable cause to search either booth. Probable cause is a “more probable than not” standard.
“In passing on whether there was probable cause for an arrest, we consistently have made it plain that the basis for such a belief must not only be reasonable, but it must appear to be at least more likely than not that a crime has taken place and that the one arrested is its perpetrator” (People v Carrasquilla, 54 NY2d 248, 254 [1981]; see People v Mercado, 68 NY2d at 877; People v Carpenter, 213 AD2d 747 [1995]).
Their actions therefore constituted a search in the absence of probable cause.
Detective Valentin did not open the door and order the defendant out because of any activity that the police observed him doing in the booth. They removed him so that they could take him to the undercover officer to see if he was the person who had sold him drugs a short time before. After they ordered him out they did the same with another person. Presumably they would have continued to remove people had there been other occupied booths. The People note in passing that the defendant does not have standing to challenge the activities of the police insofar as they relate to any booth but the one he was in. Their observation is correct, but beside the point. The defendant has standing to challenge the intrusion by the police of the booth he was using, and that intrusion is the one which led to the discovery of the physical evidence and the confirmatory identification at issue here.
As the defendant had an expectation of privacy in the booth, the police did not act reasonably under the circumstances. They had no basis to believe that he knew that they had observed the *258 drug sale or was aware of their presence. He was certainly not attempting to escape from them, as he had closeted himself in a confined area with only one means of egress. There were a number of officers in the store, and even if he had wanted to escape, he could not have done so. Additionally, exigent circumstances did not support their intrusion. The police had no reason to believe that he posed any danger to them, was attempting to dispose of evidence of a crime, or was engaged in criminal activity while he was in the booth. Nor was this a case where the perpetrator could have been elsewhere and it was therefore necessary for the police to quickly verify a suspect’s identity. There was no reason to invade defendant’s privacy. The police could have simply waited a short while and apprehended him unawares as he walked away from the booth.
Accordingly, defendant’s application to suppress the items seized from the booth and from his person is granted. I find that the undercover officer made a confirmatory identification of the defendant, but that the police had no right to remove him from the booth to display him to the primary undercover officer. The confirmatory identification is therefore suppressed (see People v Gethers, 86 NY2d 159 [1995]). The People, citing People v Ramos (206 AD2d 260 [1994]), argue that suppression of the identification is not required. They claim that, as the identification took place outside the video store, the taint stemming from improper seizure was attenuated. Ramos is distinguishable from the case before me because it concerned a case in which the police committed a Payton violation but had probable cause to arrest (see Payton v New York, 445 US 573 [1980]). In that situation, attenuation may permit the introduction at trial of the confirmatory identification (see New York v Harris, 495 US 14 [1990]). Where the police lack probable cause, the exclusionary rule requires suppression of the confirmatory identification (see People v Gethers, 86 NY2d 159 [1995]; United States v Crews, 445 US 463 [1980]). An independent source hearing is ordered to determine whether the primary undercover officer may identify the defendant at trial (see United States v Crews, 445 US 463 [1980]; People v Porter, 211 AD2d 469 [1995]).

 Although there are video booths which permit the occupant to be seen by someone in an adjoining booth, there was no testimony that the booth at issue here was of this type.